# EXHIBIT 2

# In The Matter Of:

*Lewis B. Sykes, Jr. vs.*
*RBS Citizens, N.A., et al.*

---

*Eric G. Mart*
*Vol. I*
*June 10, 2015*

---

*Connelly Reporting & Video Services, Inc.*
*32 Gault Road*
*Bedford NH 03110*
*(603) 472-5745*

Original File Mart 061015.txt
**Min-U-Script® with Word Index**

                                    VOLUME: I
                                    PAGES: 1-95

                  UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW HAMPSHIRE


      * * * * * * * * * * * * * * * * * *

LEWIS B. SYKES, JR.

v.                                    1:13-cv-00334-JD

RBS CITIZENS, N.A., et al.

      * * * * * * * * * * * * * * * * * *



                  DEPOSITION OF ERIC G. MART

          This deposition was taken at the offices of

          Primmer, Piper, Eggleston & Cramer, 900 Elm

          Street, Manchester, New Hampshire, on

          Wednesday, June 10, 2015, commencing at 10:37

          a.m.

Mart 6/10/15

2

1                          APPEARANCES

2

   Representing Bank of America, N.A. and Bank of New York
3  Mellon:

4

       PRIMMER, PIPER, EGGLESTON & CRAMER PC
5      900 Elm Street, 19th Floor
       Manchester, New Hampshire 03101
6      By:  Thomas J. Pappas, Esq.
       tpappas@primmer.com

7

8      WINSTON & STRAWN
       100 N. Tyron Street, 29th Floor
9      Charlotte, North Carolina 28202
       By: Elizabeth Ireland, Esq.
10     eireland@winston.com

11

12 Representing CCO Mortgage Corporation, Federal National
   Mortgage Association, RBS Citizens, N.A.:
13
       HARMON LAW OFFICES, P.C.
14     150 California Street
       Newton, Massachusetts 02458
15     By:  Andrea V. Lasker, Esq.
       alasker@harmonlaw.com

16

17 Representing New England Coastal Realty, Inc.:

18     WADLEIGH, STARR & PETERS
       95 Market Street
19     Manchester, New Hampshire 03101
       By:  Robert E. Murphy, Jr., Esq.
20     rmurphy@wadleighlaw.com

21

   Court Reporter:  Megan M. Hefler, LCR, RDR
22                  Registered Diplomate Reporter
                    License Court Reporter
23                  NH LCR No. 61 (RSA 310-A)

Mart 6/10/15

3

1                          STIPULATIONS

2

3         It is agreed that the deposition shall be taken in
   the first instance in stenotype and when transcribed
   may be used for all purposes for which depositions are
4  competent under New Hampshire practice.

5         Notice, filing, caption, and all other formalities
   are waived.  All objections except as to form are
6  reserved and may be taken in court at time of trial.

7         It is further agreed that if the deposition is not
   signed within 14 days after submission to counsel, the
8  signature of the deponent is waived.

9

10                         I N D E X

11        Deponent:

12        Eric G. Mart

13        Examination by Mr. Pappas: P.6 & 92

14        Examination by Mr. Murphy: P.77

15        Examination by Ms. Lasker: P.88

16        Errata page:  P.94

17                       E X H I B I T S

18

19         Number              Description            Page

20        Exhibit 1          Curriculum vitae
                             of Dr. Mart ............   8
21
          Exhibit 2          10/22/14 report .........  10
22
          Exhibit 3          Verified third
23                           amended complaint .......  11

Mart 6/10/15

4

1                          E X H I B I T S
                             (Continued)
2

3          Number                Description              Page

4
            Exhibit 4       Standard intake form .....   20
5
            Exhibit 5       Handwritten notes
6                           of interview .............   67

7          Exhibit 5A       Clinical interview/history
                            documents ................   67
8
            Exhibit 6       Notes of conversation with
9                           Peter Sykes ..............   68

10          Exhibit 7       Notes of conversation with
                            Mr. Piro .................   68
11
            Exhibit 8       Mental status exam form ..   69
12
            Exhibit 9       Authority to Exchange
13                          Information forms ........   70

14          Exhibit 10      Intake form, client
                            demographic info .........   70
15
            Exhibit 11      Mr. Piro's documents .....   72
16
            Exhibit 12      "Recollections: Day in the
17                          Life Of" documents .......   72

18          Exhibit 13      "A Timely Statement from
                             Mr. Steve Piro" document   73
19
            Exhibit 14      NAB scoring for screening
20                          module ...................   73

21          Exhibit 15      Record form for the NAB ... 74

22          Exhibit 16      RAIT scoring sheet ........ 74

23          Exhibit 17      TSI-2 scoring sheet ....... 75

5

                    E X H I B I T S
                       (Continued)


        Number              Description            Page

     Exhibit 18        PAI scoring sheet .......  75

     Exhibit 19        SWAP-200 scoring sheet ..  75

     Exhibit 20        Montreal Cognitive
                       Assessment scoring sheet   75

     Exhibit 21        NAB scoring sheet .......  76

     Exhibit 22          Subpoena ...............  93

             (Exhibits retained by Attorney Pappas.)

Mart 6/10/15

| | | |
|---|---|---|
| 1 | | ERIC G. MART, being first duly sworn, |
| 2 | | deposes and states as follows: |
| 3 | | EXAMINATION |
| 4 | Q. | (BY MR. PAPPAS)  Could you state your full name and |
| 5 | | address for the stenographer? |
| 6 | A. | Sure.  Eric Galen Mart.  That's M-a-r-t.  My |
| 7 | | address is 230 Lafayette Road, D7, Portsmouth, New |
| 8 | | Hampshire, 03801. |
| 9 | Q. | Dr. Mart, as I mentioned a moment ago, myself and |
| 10 | | Elizabeth Ireland next to me represent Bank of |
| 11 | | America and Bank of New York Mellon in this case. |
| 12 | | The other attorneys represent other defendants, |
| 13 | | and they're going to introduce themselves when the |
| 14 | | time comes. |
| 15 | A. | Okay. |
| 16 | Q. | I know you are familiar with the procedure for |
| 17 | | depositions, so I won't repeat it, but I will add |
| 18 | | that if I ask you a question and you don't ask |
| 19 | | about the question, everybody will assume you |
| 20 | | understood the question.  So if you don't |
| 21 | | understand a question, please say so, and I'll try |
| 22 | | to rephrase it or answer any questions you have. |
| 23 | | If at any time you want to clarify or complete a |

1          prior answer you've given because something comes

2          to mind, ask and I'll give you the chance to do

3          so.  Or if you want to add anything to the record

4          because you think it makes it more complete, ask

5          and I'll give you that chance as well.  Do you

6          understand that?

7    A.    Sure.

8    Q.    How old are you?

9    A.    I'm 59 years old.

10   Q.    Are you married?

11   A.    I am.

12   Q.    Do you have children?

13   A.    I have one son.

14   Q.    Okay.  I'm going to show you, which was a copy of

15         your CV which was given to us --

16   A.    Okay.

17   Q.    -- and ask you if that's current.  Take a quick

18         look at that.

19   A.    Is that --

20              MR. PAPPAS:  Off the record.

21                 (Discussion off the record.)

22   Q.    Dr. Mart, you've come with your entire file

23         regarding Mr. Sykes; is that correct?

| | | |
|---|---|---|
| 1 | A. | I have. |
| 2 | Q. | And within that file is a copy of your CV.  And |
| 3 | | let me show it to you. |
| 4 | A. | Yes. |
| 5 | Q. | Is this a copy that was in your file current? |
| 6 | A. | This is updated. |
| 7 | | MR. PAPPAS:  Okay.  Let us mark this one as |
| 8 | | Exhibit 1. |
| 9 | | (Exhibit 1 marked.) |
| 10 | Q. | Now, do you also have a list of cases during the |
| 11 | | past four years that you've either testified in |
| 12 | | court or testified in deposition? |
| 13 | A. | I do. |
| 14 | Q. | I would ask after the deposition if you could |
| 15 | | provide that to me. |
| 16 | A. | I'll do that. |
| 17 | Q. | I'm going to ask you some questions about your |
| 18 | | retention to work with Mr. Sykes, and if you need |
| 19 | | to refer to your file, you're free to do so. |
| 20 | A. | Sure. |
| 21 | Q. | Who retained you to evaluate Mr. Sykes? |
| 22 | A. | It was his counsel at the time, whose name I'm |
| 23 | | blocking at the moment, but I can -- |

9

| 1 | Q. | Attorney Harman? |
|---|---|---|
| 2 | A. | Yes. |
| 3 | Q. | And did Attorney Harman provide you with a |
| 4 |  | retainer letter of any sort? |
| 5 | A. | I don't recall. |
| 6 | Q. | Okay.  Do you have a standard retainer letter that |
| 7 |  | you use? |
| 8 | A. | More or less standard.  We change it according to |
| 9 |  | circumstances. |
| 10 | Q. | I didn't notice one in this file that you brought. |
| 11 | A. | I could -- I could dig through it.  There may be |
| 12 |  | one. |
| 13 | Q. | If there's not one and you have one back at the |
| 14 |  | office, I'd ask that you send that to me as well. |
| 15 | A. | Okay. |
| 16 | Q. | Tell us what you were retained to do. |
| 17 | A. | As I recall, Attorney Harman sketched out some of |
| 18 |  | what, her version of circumstances of the case and |
| 19 |  | asked me to do an examination of Mr. Sykes. |
| 20 | Q. | And as I understand it, you produced a report. |
| 21 | A. | Is that it? |
| 22 | Q. | No. |
| 23 | A. | This is mine. |

1  Q.  Oh, I'm sorry.  No wonder I can't find it.  You

2      produced a report after examining Mr. Sykes; is

3      that right?

4  A.  Yes.

5          MR. PAPPAS:  Can we mark that as Exhibit 2?

6          (Exhibit 2 marked.)

7  Q.  I'm going to show you what we marked as Exhibit 2.

8      Did you author that report?

9  A.  Yes.

10 Q.  And on the last page is that your signature?

11 A.  Yes.

12 Q.  Now, this report is dated October 22, 2014.  Have

13     you done any other work regarding Mr. Sykes since

14     October 22, 2014?

15 A.  No.

16 Q.  Other than being retained to evaluate Mr. Sykes

17     and produce the report we marked as Exhibit 2,

18     have you been retained to do anything else with

19     respect to Mr. Sykes?

20 A.  No.

21 Q.  Have -- let me show you a document that's in your

22     file, which is captioned, "The Third Amended

23     Verified Complaint as allowed by the Court

| | | |
|---|---|---|
| 1 | | Order" -- strike that -- "as Allowed By the Order |
| 2 | | dated September 10, 2014" in the case captioned |
| 3 | | Lewis B. Sykes, Jr. v. RBS Citizens, et al., and |
| 4 | | show you a copy of that third amended complaint. |
| 5 | A. | Yes. |
| 6 | | MR. PAPPAS:  Mark that as the next exhibit. |
| 7 | | (Exhibit 3 marked.) |
| 8 | Q. | We've marked as Exhibit 3 Mr. Sykes' third amended |
| 9 | | verified complaint in this lawsuit, and how did |
| 10 | | you obtain a copy of that amended complaint? |
| 11 | A. | I believe it was sent to me by his attorney at |
| 12 | | that time. |
| 13 | Q. | And I'll represent to you that this deposition is |
| 14 | | being taken as part of the lawsuit that that |
| 15 | | complaint covers. |
| 16 | A. | Okay. |
| 17 | Q. | Have you been retained to serve as an expert |
| 18 | | witness in this lawsuit? |
| 19 | A. | I think that that sort of depended at the time I |
| 20 | | did it on how the evaluation came out, but my |
| 21 | | assumption was that if it was something that the |
| 22 | | attorney felt was useful, that I would be called |
| 23 | | to testify. |

1  Q.  Have you been contacted by the attorney since you

2      produced your report to serve as an expert

3      witness?

4  A.  No.  In fact, I don't recall the exact

5      circumstances, but I think it was because I hadn't

6      heard anything, I called Attorney Harman and she

7      told me that she was no longer representing

8      Mr. Sykes.

9  Q.  Have you spoken with Mr. Sykes since October 22,

10     2014?

11 A.  A couple of times.

12 Q.  Tell me when is the first time after October 22,

13     2014 that you spoke with him.

14 A.  I don't recall the exact date.  The first time was

15     after Attorney Harman was no longer working with

16     him.  He had called and asked for materials from

17     my file.  Apparently, I had not gotten to them

18     quite fast enough, and he showed up in the office

19     and asked for them, and that was the extent of our

20     sort of back and forth.

21 Q.  When's the next time you spoke to him?

22 A.  Like in the last couple of weeks he came in and

23     basically to tell me that there was this

13

| | | |
|---|---|---|
| 1 | | deposition, but that he wasn't in control of |
| 2 | | scheduling, and that prompted my call to you. |
| 3 | Q. | In either of your discussions with Mr. Sykes at |
| 4 | | the time he came to pick up material or the time |
| 5 | | he came to your office to talk about the |
| 6 | | deposition, did he say to you that he wanted to |
| 7 | | retain you or use you as an expert witness in this |
| 8 | | case? |
| 9 | A. | No. |
| 10 | Q. | And has Mr. Sykes retained you as an expert |
| 11 | | witness in this case? |
| 12 | A. | No. |
| 13 | Q. | Other than discussing the material in your file, |
| 14 | | or at least producing the material in your file, |
| 15 | | and discussing this deposition, have you discussed |
| 16 | | the substance of your October 22, 2014 report with |
| 17 | | Mr. Sykes? |
| 18 | A. | No.  These were very brief discussions. |
| 19 | Q. | And would I be correct in saying that you didn't |
| 20 | | discuss the substance of this case with Mr. Sykes? |
| 21 | A. | No. |
| 22 | Q. | No, you did not? |
| 23 | A. | I did not. |

Case 1:13-cv-00334-JD  Document 120-3  Filed 07/02/15  Page 16 of 110

```
1                  MR. PAPPAS:  Can we go off the record for a
2          minute?
3                  (Discussion off the record.)
4                  (Recess taken; 10:48-10:53 a.m.)
5    Q.   (BY MR. PAPPAS)  Dr. Mart, could you tell us what
6          experience you have in diagnosing someone's legal
7          capacity?
8    A.   It's come up a few times, not as often as some of
9          the other civil capacities, but there have been
10         maybe seven or eight cases in my career where the
11         ability to contract or enter into legal settlement
12         or that type of thing has come up.
13   Q.   Do you recall the most recent case?
14   A.   It's been awhile.
15   Q.   Have you ever had a case where you were asked to
16         determine whether somebody has regained their
17         legal capacity?
18   A.   No.
19   Q.   Have you done any research or study of that issue,
20         as to when there's an issue as to whether someone
21         has regained legal capacity?
22   A.   I have.
23   Q.   And tell us what you've done.
```

| | | |
|---|---|---|
| 1 | A. | I recently -- it's in press.  I recently |
| 2 | | co-authored a chapter in the Handbook of Forensic |
| 3 | | Neuropsychology published by the American |
| 4 | | Psychological Association where we covered a |
| 5 | | variety of civil competencies, and in the course |
| 6 | | of doing that I researched a variety of capacity |
| 7 | | assessment protocols. |
| 8 | Q. | And that included regaining capacity? |
| 9 | A. | You know, I don't know if -- I think it's more a |
| 10 | | question of whether somebody either has it, has it |
| 11 | | at that particular moment or doesn't have it. |
| 12 | Q. | Do you recall when that publication was? |
| 13 | A. | It hasn't come out yet.  It's in press. |
| 14 | Q. | Oh, it's in press.  When did you do the work for |
| 15 | | that? |
| 16 | A. | Over the last three, four months.  I think we |
| 17 | | finally got it going in May. |
| 18 | Q. | Okay.  Let me note for the record that you're here |
| 19 | | pursuant to a subpoena served on you; is that |
| 20 | | correct? |
| 21 | A. | That's correct. |
| 22 | | MR. PAPPAS:  I note for the record that |
| 23 | | Mr. Sykes was provided with a copy of that |

16

| | | |
|---|---|---|
| 1 | | subpoena, and that he is not present for today's |
| 2 | | deposition. |
| 3 | Q. | I'm going to ask you some questions about your |
| 4 | | report, so we've marked that as Exhibit 2.  If you |
| 5 | | have that in front of you, it will be helpful. |
| 6 | A. | Sure. |
| 7 | Q. | The report we marked as Exhibit 2 is the only |
| 8 | | report you've done regarding Mr. Sykes? |
| 9 | A. | Yes. |
| 10 | Q. | And does this report contain all of the opinions |
| 11 | | that you have rendered regarding Mr. Sykes? |
| 12 | A. | Yes. |
| 13 | Q. | Now, the date of assessment is 9/23/2014.  Do you |
| 14 | | see that? |
| 15 | A. | Yes. |
| 16 | Q. | Is that the date you met with Mr. Sykes? |
| 17 | A. | That's the date he came to the office. |
| 18 | Q. | Did you meet with him just once? |
| 19 | A. | Yes. |
| 20 | Q. | And the date of the report, October 22, 2014, is |
| 21 | | that the date that you completed the report? |
| 22 | A. | Yes. |
| 23 | Q. | I asked you this before, but I just want to |

17

| | | |
|---|---|---|
| 1 | | confirm.  You've done no work regarding Mr. Sykes |
| 2 | | since you completed this report on October 22, |
| 3 | | 2014, correct? |
| 4 | A. | I have not done any work since then. |
| 5 | Q. | If you look at the paragraph under "Referral |
| 6 | | information," would I be correct in saying that |
| 7 | | the information you learned in that first |
| 8 | | paragraph you learned from Mr. Sykes' prior |
| 9 | | counsel? |
| 10 | A. | Yes. |
| 11 | Q. | Now, the last sentence in the first paragraph |
| 12 | | states, "This evaluation was requested in order to |
| 13 | | provide the court with information regarding |
| 14 | | Mr. Sykes' mental state during the time period in |
| 15 | | question."  Do you see that? |
| 16 | A. | Yes. |
| 17 | Q. | What time period were you referring to? |
| 18 | A. | The time period when he did not file properly.  As |
| 19 | | I sit here, I don't recall exactly when it was. |
| 20 | Q. | Does your report cover a specific time period? |
| 21 | A. | I know that some of this, at least in terms of |
| 22 | | what he was telling me, occurred around 2008 and |
| 23 | | 2009. |

1   Q.   Your report, I gather, is your opinion as of

2        October 22, 2014; is that right?

3   A.   Right.  It's about his likely mental state at the

4        time this was -- that was occurring, but I

5        evaluated him and the tests I gave him reflect

6        primarily on the state he was in when I saw him.

7   Q.   Okay.  Let me make sure I'm clear about that.

8           MR. PAPPAS:  Could you read back that last

9        answer?

10          (Requested testimony read.)

11   Q.   So I take it from your answer there are two

12        things.  One, you gave him tests the day you saw

13        him on September 23, 2014, correct?

14   A.   Yes.

15   Q.   And so those tests would have reflected his mental

16        state as of that date?

17   A.   Yes.  That's correct.

18   Q.   But you've rendered opinions about his mental

19        state in a prior date?

20   A.   Yes.

21   Q.   And sitting here today, do you recall what that

22        prior date was?

23   A.   There's reference in my report to his having had

19

| | | |
|---|---|---|
| 1 | | some of these difficulties back in the 2008-2009 |
| 2 | | time frame. |
| 3 | Q. | So that would be the prior date that your opinions |
| 4 | | relate to? |
| 5 | A. | Right.  That's my understanding of when this |
| 6 | | particular difficulty went down. |
| 7 | Q. | Under "Referral information" you indicate that you |
| 8 | | discussed the purpose of the evaluation with |
| 9 | | Mr. Sykes; do you see that? |
| 10 | A. | Yes. |
| 11 | Q. | Tell me what you and he discussed. |
| 12 | A. | I have a standard form that's in my file.  First |
| 13 | | of all, the person reads the intake form.  It has |
| 14 | | some information on it.  But I also like to talk |
| 15 | | to them face to face, talk about what I'm going to |
| 16 | | be doing, who I am, the limits of confidentiality, |
| 17 | | and some of the, some of the things I'm required |
| 18 | | to say by state law about threats to other people, |
| 19 | | suicidality, you know, inappropriate sexual |
| 20 | | behavior, that type of thing. |
| 21 | Q. | Is that standard form within your file? |
| 22 | A. | It should be.  I'm not finding it, but I recall |
| 23 | | doing it with him.  Here it is. |

1   Q.  Okay.

2         MR. PAPPAS:  Why don't we mark this as the

3      next exhibit.

4         (Exhibit 4 marked.)

5   Q.  Dr. Mart, let me show you what we've marked as

6      Exhibit 4.  Is this the standard form to which you

7      referred a moment ago?

8   A.  The one on top is the one I'm referring to, yes.

9   Q.  And the next form is your fee schedule and billing

10     policies?

11  A.  Yes.

12  Q.  And then under that is your authority to exchange

13     information?

14  A.  Correct.

15  Q.  I'm going to ask you some questions now about the

16     section of your report entitled, "Record review."

17     Your report identifies two documents.  The first

18     is the third amended verified complaint, and the

19     second document you identify is documentation from

20     Steven Piro.  Do you see that?

21  A.  Yes.

22  Q.  Did you review any other documents other than the

23     documents you've identified here?

| | | |
|---|---|---|
| 1 | A. | Mr. Sykes dropped by or brought with him a |
| 2 | | document entitled, "A Day in the Life."  It was |
| 3 | | sort of a biographical piece -- this is it -- |
| 4 | | where he talked about some of his concerns.  I |
| 5 | | looked at it.  It was kind of hard to follow.  It |
| 6 | | wasn't really germane to what I was doing. |
| 7 | Q. | Would I be correct in saying that the document |
| 8 | | Mr. Sykes dropped off entitled "Recollections:  A |
| 9 | | Day in the Life" was not used for purposes of |
| 10 | | evaluating Mr. Sykes? |
| 11 | A. | Maybe in the most general terms it gave me a |
| 12 | | little flavor of his thought processes, but it |
| 13 | | really wasn't that important to me. |
| 14 | Q. | Would I be correct in saying that the information |
| 15 | | that you learned from the documents you identify |
| 16 | | in your report, you assume that information to be |
| 17 | | true? |
| 18 | A. | Not entirely.  You know, one of the things that I |
| 19 | | routinely do as I've gotten a little more |
| 20 | | experienced is I understand that the |
| 21 | | representations that people make can often be |
| 22 | | very, very different from the reality of the |
| 23 | | situation.  It's even more difficult for me in a |

|    |     |                                                     |
|----|-----|-----------------------------------------------------|
| 1  |     | situation that's legally complex.  In other words,  |
| 2  |     | this is, to me, a very complicated document, and I  |
| 3  |     | don't really understand all the laws involved.      |
| 4  | Q.  | "This" being Exhibit 3?                             |
| 5  | A.  | Exhibit 3, yes.  And I have sometimes found out     |
| 6  |     | that what's being represented does not comport      |
| 7  |     | completely or at all with what people are saying    |
| 8  |     | to me, right.  And I make it clear to the           |
| 9  |     | retaining attorney that if I discover -- you know,  |
| 10 |     | if I'm asked questions on the stand and it turns    |
| 11 |     | out that I'm operating on false premises, that      |
| 12 |     | that's their problem, not mine.                     |
| 13 | Q.  | But for purposes of your evaluation, do you recall  |
| 14 |     | learning anything in the documents you reviewed     |
| 15 |     | that you did not assume to be true?                 |
| 16 | A.  | No.  I really wasn't in a position to know          |
| 17 |     | objectively.                                        |
| 18 | Q.  | Now, you have a summary in your report of the       |
| 19 |     | documents you reviewed.  Would I be correct in      |
| 20 |     | saying that your summary contains the information   |
| 21 |     | that you thought was important and relevant for     |
| 22 |     | purposes of your evaluation?                        |
| 23 | A.  | Yes.                                                |

|    |    |                                                       |
|----|----|-------------------------------------------------------|
| 1  | Q. | The documentation that you received from Mr. Piro,    |
| 2  |    | is that contained within your file?                   |
| 3  | A. | I believe so.  It's possible that -- you know, as     |
| 4  |    | I'm sitting here -- I kind of rushed out -- it may    |
| 5  |    | be on my computer because I'm not seeing it here.     |
| 6  | Q. | I would ask that when you get back to your office     |
| 7  |    | to check your computer if you have any information    |
| 8  |    | on your computer relating to Mr. Sykes, that you      |
| 9  |    | either print it and send me a hard copy, or if        |
| 10 |    | it's more convenient, you can e-mail it to me as      |
| 11 |    | well.                                                 |
| 12 | A. | Sure.                                                 |
| 13 | Q. | Let me ask you a few questions about the              |
| 14 |    | collateral interviews you conducted.  The first       |
| 15 |    | one you indicated you had an opportunity to speak     |
| 16 |    | with Mr. Piro on October 16, 2014; do you see         |
| 17 |    | that?                                                 |
| 18 | A. | Yes.                                                  |
| 19 | Q. | Was that the first time that you spoke with him       |
| 20 |    | regarding Mr. Sykes?                                   |
| 21 | A. | I think it was the only time I spoke to him.          |
| 22 | Q. | Okay.  Was that face to face or by phone?             |
| 23 | A. | By phone.                                             |

| 1 | Q. | Do you recall how long you and Mr. Piro spoke? |
|---|---|---|
| 2 | A. | Maybe 15, 20 minutes. |
| 3 | Q. | Would I be correct in saying that the description |
| 4 | | of your conversation with Mr. Piro in your report |
| 5 | | contains the information you thought important and |
| 6 | | relevant in evaluating Mr. Sykes? |
| 7 | A. | Yes. |
| 8 | Q. | Was it your understanding that Mr. Sykes first saw |
| 9 | | Mr. Piro in an attempt to repair his marital |
| 10 | | relationship? |
| 11 | A. | Yes. |
| 12 | Q. | That Mr. Sykes at that point had been separated |
| 13 | | from his wife? |
| 14 | A. | That's correct. |
| 15 | Q. | And was it your understanding that the foreclosure |
| 16 | | on Mr. Sykes' home was one of the issues that led |
| 17 | | to the breakup or the separation of Mr. Sykes and |
| 18 | | his wife? |
| 19 | A. | Yes.  I believe that he, Mr. Sykes, had told him |
| 20 | | that his wife sort of blamed him for not -- for |
| 21 | | allowing it to occur. |
| 22 | Q. | And was it your understanding that Mr. Piro's |
| 23 | | initial work with Mr. Sykes related to the breakup |

25

| | | |
|---|---|---|
| 1 | | of his marriage in trying to reunite Mr. Sykes |
| 2 | | with his wife? |
| 3 | A. | Correct.  I believe that he -- it actually started |
| 4 | | out as marriage counseling. |
| 5 | Q. | And was it your understanding at some point after |
| 6 | | Mr. Piro began seeing Mr. Sykes they also started |
| 7 | | focusing or discussing Mr. Sykes', the foreclosure |
| 8 | | on his home, and issues surrounding that? |
| 9 | A. | Right.  I think when he started working more |
| 10 | | individually with him, that became more of a |
| 11 | | focus. |
| 12 | Q. | Do you recall when that was? |
| 13 | A. | I don't recall, and I'm not sure where in that |
| 14 | | process that became the focus. |
| 15 | Q. | Do you know how that became the focus? |
| 16 | A. | I think, if I recall correctly, that it was clear |
| 17 | | that he wasn't having much luck with the |
| 18 | | reunification.  They switched to sort of |
| 19 | | individual therapy, and that's what Mr. Sykes was |
| 20 | | identifying as his major stressor. |
| 21 | Q. | And was it your understanding that the major |
| 22 | | stressor of Mr. Sykes was the foreclosure of his |
| 23 | | home? |

26

1   A.   Well, that's what he was reporting.

2   Q.   Reporting to Mr. Piro?

3   A.   Yes.

4   Q.   Now, your report states, in the discussion of your

5        conversations with Mr. Piro, that Mr. Piro

6        reported to you that when Mr. Sykes became aware

7        that there was a problem with his mortgage, he

8        began searching the Internet and spent hours

9        attempting to resolve the problem himself.  Do you

10       see that?

11  A.   Yes.

12  Q.   Do you know how Mr. Sykes became aware there was a

13       problem with his mortgage?

14  A.   I recall that he received some notification that

15       there was some difficulty or that there had been

16       some payments not made and that there was some

17       type of proceeding that was going to be taking

18       place.

19  Q.   So the problem with his mortgage arose, or

20       Mr. Sykes became aware of the problem with his

21       mortgage before his house was foreclosed upon?

22  A.   I think what he -- well, do you mind if I refer to

23       my report?

1    Q.   You may.

2    A.   Based on what he was telling me, that he saw a

3         $400 charge that appeared on his mortgage that he

4         didn't think belonged there, and then he began

5         pursuing this, talking to people, and then, to be

6         clear, when you get into this type of thing with

7         Mr. Sykes, or at least when I did, he becomes very

8         circumstantial.  That's a term of art.  In other

9         words, he gives you a very involved story which is

10        really more information than I needed.  He will

11        get back to the point eventually, but there's a

12        lot of who did what to who and what was right and

13        what was wrong and how individuals fabricated

14        documents and that type of thing.  But my

15        impression was that he got very involved in trying

16        to resolve this issue and never really gave me a

17        good answer as to why he didn't do what I thought

18        would be the obvious thing.  You know, if I got a

19        notice, "Honey, we're being foreclosed.  I don't

20        know what's going on here," the first thing I

21        would do is I would get a lawyer and say, "Look,

22        can you get an injunction or something?"  Right.

23        And I really never got a good answer about that.

28

1    Q.   You never got an answer from Mr. Sykes?

2    A.   Yes.

3    Q.   Based on your discussions with Mr. Piro and

4         Mr. Sykes was it your understanding that when Mr.

5         Piro started counseling Mr. Sykes one on one, the

6         focus of that counseling was the issues

7         surrounding Mr. Sykes' mortgage?

8    A.   Right.   Mr. Piro came to believe that Mr. Sykes

9         was suffering from what he termed PTSD/Legal Abuse

10        Syndrome, and that that became the focus of their

11        work.

12   Q.   Now, in your opinion the diagnosis by Mr. Piro of

13        Mr. Sykes having PSTD [sic] syndrome was an

14        incorrect diagnosis?

15   A.   I thought so, yes.

16   Q.   And that's because Mr. Sykes didn't meet the

17        diagnostic criteria for PSTD?

18   A.   Right.   The entry criteria, and you can look at

19        DSM-IV or DSM-5, is that you have to suffer some

20        type of experience where you thought that you

21        might die or be seriously injured or somebody

22        close to you has that experience, and that

23        experience fills you with fear and terror and

| | | |
|---|---|---|
| 1 | | panic.  You know, bad things can happen to people, |
| 2 | | but this was not that type of thing. |
| 3 | Q. | Now, you also spoke with Mr. Sykes' son, Peter, by |
| 4 | | phone; do you see that? |
| 5 | A. | Yes. |
| 6 | Q. | Did you speak with Mr. Sykes' son Peter one time? |
| 7 | A. | Just one time. |
| 8 | Q. | Do you recall how long you spoke with him? |
| 9 | A. | Again, like 15, 20 minutes. |
| 10 | Q. | And does your report summarize what you thought |
| 11 | | was important and relevant for your evaluation of |
| 12 | | Mr. Sykes, the information you learned from his |
| 13 | | son Peter? |
| 14 | A. | Yes. |
| 15 | Q. | Did you interview anybody else other than Mr. |
| 16 | | Piro, Peter Sykes, and Lewis Sykes himself? |
| 17 | A. | You know, I believe I made an attempt to talk -- I |
| 18 | | suggested it might be good to talk to his ex-wife |
| 19 | | and was discouraged from doing so by his attorney. |
| 20 | Q. | Did his attorney tell you why she didn't think |
| 21 | | that was a good idea? |
| 22 | A. | You know, I don't remember the exact wording of |
| 23 | | it, but I think that there was sufficient tension |

**Mart 6/10/15**

|    |    |                                                     |
|----|----|-----------------------------------------------------|
| 1  |    | between the two of them that she didn't think that |
| 2  |    | it would be a useful conversation.                 |
| 3  | Q. | Let me ask you some questions about the section    |
| 4  |    | "Mental Status Examination."  Did you conduct this |
| 5  |    | examination on September 23, 2014 when you met     |
| 6  |    | with Mr. Sykes?                                     |
| 7  | A. | Yes.  And can I explain a little bit what that is? |
| 8  | Q. | You may.                                            |
| 9  | A. | You know, when you go to a psychologist or a       |
| 10 |    | physician, there's two phases of what they're      |
| 11 |    | doing.  Symptoms are what I say I have.  "I have a  |
| 12 |    | terrible headache."  Signs are what I, what the    |
| 13 |    | doctor observes.  You know, "I have eczema,"        |
| 14 |    | whatever, right?  While you're doing everything     |
| 15 |    | else, while you're inviting the person in from the |
| 16 |    | waiting room, while you're talking to them, you're |
| 17 |    | looking at things like what's their speech and     |
| 18 |    | language like?  What's their thought content like? |
| 19 |    | Do they have any movement abnormalities?  So these |
| 20 |    | are basically my perceptions of his behavior in    |
| 21 |    | these areas.                                        |
| 22 | Q. | Can you tell me whether or not your perceptions as |
| 23 |    | you noted them in your report are relevant to your |

1              ultimate diagnosis?

2    A.    They had some bearing on it.  I thought that there

3          was some, some of the things he was saying in the

4          course of my conversation with him raised a

5          question of paranoid thinking, which I think does

6          play a role in his situation.  I thought that he

7          had limited insight into his problems, personal

8          problems.  Although his judgment for things like

9          why don't you leave a child around a lit candle

10         unsupervised, you know, was intact, he -- you

11         know, that's where I noticed some of the

12         circumstantiality.  He was quite talkative, but

13         there was nothing there at that point that was

14         suggestive of any kind of organic problem.

15   Q.    Did Mr. Sykes, when you made these observations --

16         strike that.

17              In making these observations of Mr. Sykes,

18         did you see any sign of mental incompetence?

19   A.    Not in and of itself.  I thought that some of the

20         circumstantiality and paranoia might play a role.

21         I mean, these are things that help you form

22         initial hypotheses.

23   Q.    Would it be fair to say that based on your

```
 1          observations of Mr. Sykes as set forth in your
 2          report, you didn't see any sign or you didn't
 3          conclude that Mr. Sykes was mentally incompetent?
 4    A.    No.    There was -- sometimes people are so impaired
 5          that you immediately have questions about their
 6          competence, and there was nothing in that part of
 7          it that made me think that immediately.
 8    Q.    The next section of your report is entitled,
 9          "Clinical Interview," and as I understand it, that
10          summarizes your interview of Mr. Sykes?
11    A.    Yes.
12    Q.    And would I be correct in saying that you've noted
13          all of the information you learned from that
14          interview that you deemed to be relevant and
15          important to your diagnosis?
16    A.    Yes.
17    Q.    Was it your understanding that Mr. Sykes had no
18          history of mental illness?
19    A.    None that he mentioned.
20    Q.    I'm going to ask you some questions starting at
21          the bottom of page 4.
22    A.    Okay.
23    Q.    That last paragraph of your report.    Now, I see
```

| | | |
|---|---|---|
| 1 | | that Mr. Sykes explained to you or described to |
| 2 | | you his current situation.  Do you see that? |
| 3 | A. | Yes. |
| 4 | Q. | And just tell us what you recall of that, |
| 5 | | summarize for us. |
| 6 | A. | He told me about these problems with his house |
| 7 | | starting in 2008, and he also talked about a |
| 8 | | problem that had occurred before; that he had a |
| 9 | | contractor who did some work for him on his house. |
| 10 | | He wasn't satisfied with it.  And he talked about |
| 11 | | how he had gone through a long legal process and |
| 12 | | spent $35,000 to recover $25,000.  And then he |
| 13 | | started talking about his, what he thought was an |
| 14 | | incorrect charge on his mortgage bill, his |
| 15 | | attempts to meet with people to get answers, and |
| 16 | | his inability to do so.  I should -- as you can |
| 17 | | see in the last line, it was difficult to keep up |
| 18 | | with him at times and he would go off on these, |
| 19 | | you know, I guess tangents about things that I |
| 20 | | didn't entirely understand what he was talking |
| 21 | | about.  So he was talking, for example, about |
| 22 | | going to some kind of -- and it's not in here; |
| 23 | | that's why I mentioned it -- going to some kind of |

| | | |
|---|---|---|
| 1 | | open house kind of thing where they had people |
| 2 | | from the state and people who did mortgages and |
| 3 | | trying to talk to people and going to different |
| 4 | | boards and not getting any response, but that's -- |
| 5 | | he also told me he thought people had impersonated |
| 6 | | him during the process, and that he simply |
| 7 | | couldn't resolve the problem. |
| 8 | | Now, I kept asking, well, you know, "What |
| 9 | | was" -- you know, "Why not do what appears to me |
| 10 | | to be the obvious thing, which is go get a |
| 11 | | lawyer?"  And I suspect, but don't know, that if |
| 12 | | there's an ambiguous situation, a judge would say, |
| 13 | | "Well, let's all hold off for a minute till we get |
| 14 | | this sorted out," and I never really got a good |
| 15 | | answer for that. |
| 16 | Q. | When he described going to open houses and boards, |
| 17 | | was that after his house was foreclosed upon and |
| 18 | | he was doing research? |
| 19 | A. | It was -- it was not clear to me.  I think it |
| 20 | | was -- my sense was he did some of that before the |
| 21 | | actual foreclosure, and then there was some of |
| 22 | | that after as well, but I think a lot of it was |
| 23 | | before. |

| | | |
|---|---|---|
| 1 | Q. | You say in this last paragraph on page 4 towards |
| 2 | | the end, "I asked Mr. Sykes how he came to miss |
| 3 | | the deadline for filing his lawsuit.  He told me |
| 4 | | that he had to relocate to Seabrook, New |
| 5 | | Hampshire.  His wife left him, in part because she |
| 6 | | felt he was responsible for the loss of the family |
| 7 | | home, and he could not work because there was no |
| 8 | | place he could refinish furniture in his rental |
| 9 | | home, and he also reports that he contacted |
| 10 | | several lawyers but they were ineffective in |
| 11 | | assisting him." |
| 12 | | Mr. Sykes describes some circumstances, but |
| 13 | | did he ever specifically tell you why it is he |
| 14 | | missed the deadline? |
| 15 | A. | No. |
| 16 | Q. | Okay.  Did Mr. Sykes ever say to you -- strike |
| 17 | | that. |
| 18 | | In your conversation with Mr. Sykes did he |
| 19 | | ever say to you that he thought he was mentally |
| 20 | | incompetent at any time? |
| 21 | A. | No, he did not.  I mean, he talked about being |
| 22 | | upset, being depressed, having difficulties.  I |
| 23 | | think -- you know, I think that he's an individual |

1       who is ambivalent about sort of making that case.

2       In other words, it's a case that he would have to

3       sort of make, but I don't think he likes to say,

4       "I went to pieces and couldn't do it," because he

5       doesn't like to think of himself as the type of

6       person that would do that.

7   Q.  But in his describing for you why he missed a

8       deadline, he never said, "I missed the deadline

9       because I was mentally incompetent"?

10  A.  No.

11  Q.  Did he ever tell you why the attorneys he

12      contacted were ineffective in assisting him?

13  A.  I think he -- I tried to elicit that and did not

14      get the kind of answer that I could sort of

15      present in a linear fashion in the report.   In

16      other words, it wasn't like he said, "Well, I went

17      to see Lawyer Smith and Lawyer Smith was drunk all

18      the time and never filed," or "I had an

19      inappropriate assistance of counsel."   That he

20      kind of implied there were difficulties, but never

21      came out and said that that was the reason.

22  Q.  Did he ever say that he fired any attorneys that

23      he met with or retained?

37

| | | |
|---|---|---|
| 1 | A. | I have some recollection of his talking, having |
| 2 | | worked with one lawyer initially and having |
| 3 | | temporarily had gotten things slowed down or |
| 4 | | stopped, but it wasn't clear why that didn't |
| 5 | | continue. |
| 6 | Q. | Was it your impression that Mr. Sykes recognized |
| 7 | | that in order to deal with the foreclosure on his |
| 8 | | house, he needed assistance of a lawyer? |
| 9 | A. | I think that, once again, my sense was that he was |
| 10 | | ambivalent about that.  In other words, I think |
| 11 | | that he went back and forth between thinking he |
| 12 | | could handle it by himself and that he probably |
| 13 | | could use a lawyer if he could get a good one, you |
| 14 | | know, or the right one, but that he was unable to |
| 15 | | do that for whatever reason. |
| 16 | Q. | Was it your impression that Mr. Sykes recognized |
| 17 | | that in order to deal with the foreclosure of his |
| 18 | | house, it involved a legal issue; he had to have |
| 19 | | some legal recourse, if you will? |
| 20 | A. | That I think he understood. |
| 21 | Q. | Was it your impression that he understood that |
| 22 | | from the time his house was foreclosed upon up |
| 23 | | until the time you interviewed him? |

| | | |
|---|---|---|
| 1 | A. | I'm sorry? |
| 2 | Q. | Sure.  Was it your impression that Mr. Sykes |
| 3 | | understood from the time his house was foreclosed |
| 4 | | upon up until the time you interviewed him in |
| 5 | | September of 2014 that in order to deal with the |
| 6 | | foreclosure of his house, that involved a legal |
| 7 | | issue, and he needed some sort of legal recourse? |
| 8 | A. | I think he knew he needed legal recourse, yes. |
| 9 | Q. | But -- was it your impression that he knew that |
| 10 | | throughout this time, and that he was seeing |
| 11 | | lawyers throughout this time, but for whatever |
| 12 | | reason they weren't able to assist him? |
| 13 | A. | That was the impression he gave me. |
| 14 | Q. | The next section of your report summarizes various |
| 15 | | tests that you administered on Mr. Sykes. |
| 16 | A. | That's correct. |
| 17 | Q. | Let me ask you generally, why did you administer |
| 18 | | these various tests? |
| 19 | A. | Well, one, you know, as you're talking to somebody |
| 20 | | and looking at the material, you're turning over |
| 21 | | different hypotheses as you're going along.  With |
| 22 | | a 70-year-old man one thing that occurred to me |
| 23 | | was that he may be -- he might have some type of |

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | dementia that something was going on with him and        |
| 2  |    | that it was organic in nature.  And there were           |
| 3  |    | some things that would, you know, about his              |
| 4  |    | behavior that were suggestive of that.  So I gave        |
| 5  |    | him an IQ test to see how he would do on that.           |
| 6  |    | And I also did the screening module of the               |
| 7  |    | neuropsychological assessment battery to determine       |
| 8  |    | whether there was any obvious problem with any of        |
| 9  |    | his cognitive processes.                                 |
| 10 | Q. | Would I be correct in saying that as a result of         |
| 11 |    | giving Mr. Sykes the IQ test and the Reynolds            |
| 12 |    | Adaptive Intelligence Test, you determined that          |
| 13 |    | Mr. Sykes was an intelligent person and scored           |
| 14 |    | either above average or average in each category?        |
| 15 | A. | Right.                                                   |
| 16 | Q. | The same would be for the neuropsychological             |
| 17 |    | assessment battery; Mr. Sykes scored average or          |
| 18 |    | above average in each category?                          |
| 19 | A. | Yes.                                                     |
| 20 | Q. | So as a result of those two tests you determined         |
| 21 |    | that Mr. Sykes was not suffering from any                |
| 22 |    | cognitive dysfunction; is that correct?                  |
| 23 | A. | That's correct.  I mean, there's nothing wrong           |

1          with the hardware.

2    Q.   In other words, you found Mr. Sykes to be a smart,

3          intelligent, well-educated person?

4    A.   Yes.

5    Q.   You then administered the personality assessment

6          inventory; do you see that?

7    A.   Yes.

8    Q.   What did you conclude after doing that test?

9    A.   Well, he was moderately defensive on the test,

10         which means that he was minimizing to some extent.

11         He was not admitting to minor shortcomings that

12         most of us would admit to if we're being honest.

13         That it wasn't enough to invalidate the test, and

14         there are some indexes that allow you to know

15         whether it's a personality style or whether

16         someone is purposely trying to look better than

17         they really are, and he didn't appear to be

18         purposely trying to do it.  That's kind of how he

19         sees himself.  He's kind of rigid.  And so he --

20         probably his scores on the scales may be lower in

21         some cases than is objectively the case.

22   Q.   As a result of administering that test, did you

23         discover any problems with his, as you put, the

| | | |
|---|---|---|
| 1 | | hardware, his cognitive ability? |
| 2 | A. | Well, this one wouldn't really assess cognitive |
| 3 | | ability, but I didn't think there were any |
| 4 | | problems with that.  He did have some -- you know, |
| 5 | | when someone is being defensive, you can still |
| 6 | | interpret elevations.  They may in reality be |
| 7 | | higher than what that person is saying, but there |
| 8 | | were some indications that he was having |
| 9 | | physiological signs of anxiety, and he had an |
| 10 | | elevation on the, one of the subscales, the |
| 11 | | anxiety-related disorders traumatic stress scale. |
| 12 | Q. | In other words, he exhibited some anxiety for some |
| 13 | | reason? |
| 14 | A. | Right.  The anxiety comes in like three different |
| 15 | | flavors.  You break it out.  You know, there's |
| 16 | | like worry.  You know, "I ruminate about things." |
| 17 | | There's a kind of an emotional sort of sense of |
| 18 | | dread, that type of thing.  And then there's the |
| 19 | | physiological signs, where you basically have -- |
| 20 | | you're short of breath, have trouble sleeping, |
| 21 | | you're jumpy, and that's what was predominant in |
| 22 | | his anxiety. |
| 23 | Q. | Did you make an assessment of what was causing |

1          that?

2    A.   You know, it doesn't -- the test does not allow

3          you to specifically go back and draw a line

4          between a particular event.  The same with the

5          trauma-related scale.

6    Q.   The next test was the trauma symptom inventory,

7          and am I correct in saying that Mr. Sykes's scores

8          on that test were normal?

9    A.   On the validity scales they were normal.

10   Q.   Were there some other scales that were not?

11   A.   Well, he had an elevation on the hyperarousal

12         scale.  He's jumpy, vigilant, concerned about

13         threats.  And also an elevation on the defensive

14         avoidance scale, which was conscious attempts to

15         keep certain unpleasant or disturbing thoughts and

16         feelings out of consciousness.

17   Q.   So the hypervigilant, jumpy elevation was similar

18         to what we saw in the prior test?

19   A.   Yes.

20   Q.   And the trying to keep unpleasant thoughts, is

21         that a rather normal thing?

22   A.   Well, it is, although if you get up high enough,

23         if you elevate, that means you are doing it a lot

1          more than most people.

2    Q.   Did you determine any significance of either of

3          those two elevations?

4    A.   Well, I think it was -- it's consistent with

5          descriptions from his other clinician in a general

6          way.  It indicated that something was bothering

7          him, and that there was some trauma-related

8          response to something that had occurred to him.

9    Q.   But that's in a general way, because you're not

10         able to, as you say, linearly attach that or

11         relate that to a specific causal event?

12   A.   Right.

13   Q.   And then the last test that you administered was

14         the Shedler-Westen Assessment Procedure.  Do you

15         see that?

16   A.   Right.  The SWAP 22 -- 200.

17   Q.   And what was your assessment of Mr. Sykes after

18         reviewing the results of that test?

19   A.   This is a test that's more related to personality

20         disorders than to what we call Axis I disorders.

21         It's not something that you give to him.  It's

22         something that I rated him on.  And I thought that

23         he had clear signs of what's referred to as

|    |     |                                                    |
|----|-----|----------------------------------------------------|
| 1  |     | obsessive-compulsive personality disorder, which  |
| 2  |     | is different from OCD, in that he has a very rigid |
| 3  |     | style, you know, very rational attempts to cope   |
| 4  |     | with things by doing what he considers to be the  |
| 5  |     | right thing.  People who know them, people like   |
| 6  |     | this, generally see them as kind of rigid, kind of |
| 7  |     | emotionally constricted.  They can be kind of     |
| 8  |     | judgmental and they build up pockets of resentment |
| 9  |     | when they feel things are not being done right.   |
| 10 |     | And, in part, because they under-respond.  I mean, |
| 11 |     | there are times when you should express some      |
| 12 |     | irritation.  He kind of sits on that until it's   |
| 13 |     | too late.                                         |
| 14 | Q.  | I understand that these last several tests we     |
| 15 |     | reviewed are geared towards personality disorders? |
| 16 | A.  | The last one in particular.                       |
| 17 | Q.  | In any of these tests that you administered with  |
| 18 |     | Mr. Sykes, did you see any evidence that Mr.      |
| 19 |     | Sykes, either the day of the assessment or any    |
| 20 |     | time prior to the assessment, exhibited any signs |
| 21 |     | of mental incompetency?                           |
| 22 | A.  | To some extent, yes.                              |
| 23 | Q.  | Tell me what.                                      |

| 1 | A. | You know, when people come for certain types of |
|---|---|---|

1   A.   You know, when people come for certain types of
2        assessments, there's kind of what we call a press
3        to have a certain type of result.  In other words,
4        if I come to you and you're going to represent me
5        in a personal-injury assessment, a hearing, and
6        I've been hit by a car, been in a car accident,
7        and I feel that, in addition to my injuries, I
8        have all kinds of mental distress.  Well, you
9        know, people shouldn't lie about that, right?  But
10       the purpose of going for that evaluation is to
11       explain to the psychologist why you have so much
12       distress, right?  Mr. Sykes really didn't get
13       that.  He didn't really understand -- it's as
14       though he did not understand why he was in my
15       office that day.  You know, what I would expect in
16       some cases would be for somebody to exaggerate.
17       You know, "When this hit me, I fell to pieces.  I
18       couldn't concentrate.  I couldn't sleep.  You
19       know, I just couldn't function, and the reason
20       that I couldn't respond in a timely fashion was
21       that I was such a basket case."
22            Mr. Sykes was coming in and kind of being
23       defensive about things.  In other words, he was --

1      what he was kind of saying was, "I'm okay.  I'm in

2      pretty good shape, and I'm a victim of

3      circumstance," but that's not, in theory, why he

4      was there.  He was there to -- in other words, his

5      lawyer was making a case that he had lacked

6      capacity at the time this was done, right?  But he

7      was resistant to telling me why he might lack

8      capacity.  So that's -- he seemed to lack insight

9      into the basic dynamics of the process.  That was

10     one general thing that I observed.

11  Q.  How is that lack of insight evidence of lack of

12     mental capacity?

13  A.  It's not in and of itself lack of capacity, but I

14     think it goes along with, you know, understanding

15     the nature of the transaction.  In other words,

16     what are we here for today, right?  You know, I'm

17     here to sort of make the case that I didn't have

18     capacity at that time, right?  And he apparently

19     didn't understand or is resistant to understanding

20     what the dynamics were, despite it having been

21     explained, according to his lawyer, on many

22     occasions.

23  Q.  Could it be equally an explanation that he

| 1 | | understood, he just didn't agree? |
|---|---|---|
| 2 | A. | You know, I think that could be part of it.  I |
| 3 | | mean, one thing that happens sometimes is when you |
| 4 | | see somebody with multiple lawyers is that the |
| 5 | | lawyers are telling them things that are accurate, |
| 6 | | but they don't want to hear it particularly.  And |
| 7 | | that could be one of the things that was going on |
| 8 | | here.  Whether that represents -- you know, |
| 9 | | whether that's something that the person couldn't |
| 10 | | do or was unwilling to do or to what extent that |
| 11 | | was under their control becomes a little more |
| 12 | | difficult to pin down. |
| 13 | Q. | Given the fact that Mr. Sykes is an intelligent, |
| 14 | | educated man and understood things that were going |
| 15 | | on, is it equally likely that it was just his |
| 16 | | personality that resulted in his delay, if you |
| 17 | | will, as opposed to any mental incompetency? |
| 18 | A. | You know, I mean, I guess I could cop out and say, |
| 19 | | "That's for the court," but, you know, because |
| 20 | | what I'm trying to do is give a description of how |
| 21 | | he got to where he got to assist the fact finder. |
| 22 | | I think that there -- this is a little bit unusual |
| 23 | | because usually, when you talk about incompetence, |

```
 1         a civil incompetence, it's like, you know, "I can
 2         no longer balance my checkbook."  It's something
 3         really obvious, right?  "I don't even know what a
 4         checkbook is anymore."  Right.  Mr. Sykes
 5         understood that there are lawyers, understood that
 6         there are courts, understood in theory there were
 7         means to address this.  And for reasons which I
 8         believe are associated with his personality
 9         structure couldn't quite pull it together to do
10         what he had to do to prevent this from happening,
11         assuming the facts as presented to me are
12         accurate.
13    Q.   Isn't that more his personality, rather than his
14         mental incompetency?  It's the way he is, rather
15         than he can't intelligently understand it because
16         he doesn't have the mental capacity to do so?
17    A.   I think you have to -- I mean, the structure that
18         I was using when I was doing this is derived from
19         Thomas Grisso's work.  And basically there's two
20         issues.  One of them is the person's strengths and
21         weaknesses in the abstract, and then there's what
22         Grisso refers to as the person in situation.  In
23         other words, to what extent does this person's
```

1           strength and weaknesses allow them to do what

2           they've got to do to be considered competent to do

3           something at that point.

4               I think that -- I guess the argument I'm

5           making is that because of his kind of rigidity,

6           obsessive pattern of thinking, difficulty taking

7           direction from anybody, the fact that he becomes

8           so outraged when he feels something is not done

9           properly or as he thinks it should be done was an

10          impediment to his doing what I thought was the

11          obvious thing in this process.  And to that extent

12          I think that he had -- that his personality and

13          the situation created problems for him doing what

14          he had to do.

15     Q.   The personality traits that he has, rigidity and

16          so forth you described, is it your opinion that

17          he's had these for quite some time?

18     A.   Yeah.  Yes, I do.

19     Q.   Typically, people who exhibit those traits have

20          them from adolescence or early adulthood on; is

21          that correct?

22     A.   Probably.  I mean, you wouldn't diagnose a

23          personality disorder before 18, but that's just

| | | |
|---|---|---|
| 1 | | arbitrary.  You know, he probably had these traits |
| 2 | | from early adulthood to the present time. |
| 3 | Q. | And, obviously, at some point Mr. Sykes initiated |
| 4 | | a lawsuit because we've already marked as an |
| 5 | | exhibit the third amended complaint of the lawsuit |
| 6 | | and we are here today because he initiated a |
| 7 | | lawsuit? |
| 8 | A. | Yes. |
| 9 | Q. | So at some point, even though he's had these |
| 10 | | traits for some time, the traits didn't prevent |
| 11 | | him from eventually filing a lawsuit, correct? |
| 12 | A. | Right.  My understanding is that he finally showed |
| 13 | | up at Attorney Harman's office, told her his view |
| 14 | | of things, showed her some documentation, and she |
| 15 | | sort of asked the same question that I asked, |
| 16 | | which is, "So why didn't you just, you know, hire |
| 17 | | somebody earlier on?  Now you missed a deadline." |
| 18 | | Right?  And this raised questions for her about |
| 19 | | why he didn't do that.  And she thought an |
| 20 | | evaluation would be helpful to help give |
| 21 | | information about that.  To, you know, to the |
| 22 | | extent that he, you know, knew to address these |
| 23 | | specific legal issues, I don't know. |

51

1   Q.   Do you know if -- strike that.

2          I take it that you learned that from your

3         discussion with either Attorney Harman or Mr.

4         Sykes?

5   A.   It was Attorney Harman.

6   Q.   And do you know if there was anything different in

7         terms of Mr. Sykes seeing Attorney Harman versus

8         Mr. Sykes seeing the other attorneys he saw before

9         her?

10  A.   I don't know what the interaction was like.  I

11        didn't speak to the previous attorneys.  I do

12        recall her telling me that it took her a long time

13        to sort of sort out what his situation was.  In

14        other words, he presented a lot of information to

15        her.  She had difficulty sort of like, so, you

16        know, finding the handle legally of what was going

17        on here; and that it was basically through

18        reviewing documents and that type of thing that

19        she began to understand the contours of the case;

20        that it was difficult to get that from him.

21  Q.   Now, when we refer to having missed the deadline,

22        do you know what the deadline was for him to file

23        suit?

| | | |
|---|---|---|
| 1 | A. | I think it's in the complaint.  I don't recall |
| 2 | | what it was. |
| 3 | Q. | But do you recall Attorney Harman telling you that |
| 4 | | he had missed the deadline to file suit and she |
| 5 | | wanted an evaluation of him in terms of a reason |
| 6 | | why he might have missed the deadline? |
| 7 | A. | Yes. |
| 8 | Q. | Let me ask you some questions about your summary |
| 9 | | and conclusion -- |
| 10 | A. | Sure. |
| 11 | Q. | -- portion of your report. |
| 12 | | Now, you start off by saying, "The results of |
| 13 | | this evaluation indicate that Mr. Sykes has above |
| 14 | | average intellectual abilities."  Do you see that? |
| 15 | A. | Yes. |
| 16 | Q. | And you also say that "His neuropsychological |
| 17 | | screening indicates that his attentional, |
| 18 | | language, memory, spatial, and executive function |
| 19 | | abilities are all average or above average, which |
| 20 | | is strongly indicative of normal cognitive |
| 21 | | functioning."  Do you see that? |
| 22 | A. | Yes. |
| 23 | Q. | I might have asked you before, but I'll repeat it. |

|    |     |                                                   |
|----|-----|---------------------------------------------------|
| 1  |     | In other words, in laymen's terms Mr. Sykes is    |
| 2  |     | intelligent, well-educated?                       |
| 3  | A.  | Yes.                                              |
| 4  | Q.  | He has rational thought?                          |
| 5  | A.  | For the most part.                                |
| 6  | Q.  | He's able to solve problems?                      |
| 7  | A.  | Generally.                                        |
| 8  | Q.  | He can function day to day?                        |
| 9  | A.  | Right.  I mean, he takes care of himself.  He --  |
| 10 |     | you know, I think at this point he's handling his |
| 11 |     | finances.  It wouldn't have occurred to me to     |
| 12 |     | suggest that he needed a guardian or something    |
| 13 |     | like that.                                        |
| 14 | Q.  | Are you aware of whether at any time during the   |
| 15 |     | past 10 years Mr. Sykes was unable to provide for |
| 16 |     | his personal needs, his food, his clothing, his   |
| 17 |     | shelter, his health, and safety?                  |
| 18 | A.  | Nobody that I spoke to who knew him -- Mr. Piro,  |
| 19 |     | his son, his attorney -- no one said that he had  |
| 20 |     | those problems.                                   |
| 21 | Q.  | You're familiar with guardianship proceedings?    |
| 22 | A.  | Yes.                                              |
| 23 | Q.  | And would it -- would I be correct in saying that |

| | | |
|---|---|---|
| 1 | | you're not aware of any evidence that would lead |
| 2 | | you to believe that at any time Mr. Sykes was in |
| 3 | | need of having a guardian appointed for him? |
| 4 | A. | No.  I don't think so. |
| 5 | Q. | You're also aware of the legal standard for |
| 6 | | testamentary capacity; is that right? |
| 7 | A. | Yes. |
| 8 | Q. | And is it your opinion that Mr. Sykes at all times |
| 9 | | has had testamentary capacity? |
| 10 | A. | You know, I didn't assess it directly, but that's |
| 11 | | such a low bar that, I mean, he -- I mean, he knew |
| 12 | | who his relatives were.  He has an idea of what |
| 13 | | his money is, you know, so I think it didn't raise |
| 14 | | any issues for me. |
| 15 | Q. | Are you aware of any standard under New Hampshire |
| 16 | | law for legal or mental capacity other than the |
| 17 | | guardianship standard and the testamentary |
| 18 | | standard that you've been involved with? |
| 19 | A. | Capacity to consent to sexual activity has been an |
| 20 | | issue.  Medical decisions has been -- has come up. |
| 21 | | A lot of these are subsumed under guardianship. |
| 22 | | Capacity to -- all the things you would check off |
| 23 | | on a guardianship form, so voting, marrying, that |

1          type of thing.

2     Q.   And in your opinion Mr. Sykes has always had the

3          necessary capacity for each of those items?

4     A.   Yes.

5     Q.   The next part of your summary conclusions talks

6          about Mr. Sykes from an emotional standpoint.

7     A.   Correct.

8     Q.   And as I understand it, you diagnosed him with

9          some emotional issues; is that right?

10    A.   Yes.

11    Q.   And you describe them as longstanding obsessional

12         personality pattern.  Do you see that?

13    A.   Yes.

14    Q.   As you said a moment ago, he's probably had that

15         since early adulthood?

16    A.   Right.

17    Q.   You go on to say, "It's very different from

18         obsessive-compulsive disorder."  Could you explain

19         to us why it's very different from compulsive,

20         from obsessive-compulsive disorder?

21    A.   Well, one big difference is that

22         obsessive-compulsive disorder, the two main

23         classifications of mental conditions, one of them,

1        one group is referred to as ego-alien.  The other
2        group is referred to as ego-syntonic.  And I hope
3        I don't have to spell syntonic.  But the idea
4        would be is that if somebody suddenly had
5        developed major depression, they would feel like
6        something wasn't right.  They would go to their
7        doctor.  They would -- just like if you got the
8        flu suddenly, you'd say, "This is not how I
9        normally feel.  Something is wrong here."  Right?
10       Personality disorders are generally ego-syntonic.
11       In other words, it would be like, you know, if you
12       have a narcissistic friend and you say, "Well, you
13       seem to think the world revolves around me," they
14       would say, "Well, what's your point?"  It's
15       something that they see as normal as who they are
16       or as part of their identity.  And it generally
17       causes problems -- well, many of them cause
18       problems for other people more than they cause
19       problems for the person who has that condition.
20       The other thing is that it's a longstanding
21       maladaptive pattern as opposed to, you know,
22       somebody suddenly breaks through and has a manic
23       episode, they go to the doctor, they get treated,

| | | |
|---|---|---|
| 1 | | and then that stops for a period of time. |
| 2 | | Whereas, I think this is kind of who he is, except |
| 3 | | that it's out on an extreme.  It's different from |
| 4 | | the -- and presents problems in functioning. |
| 5 | Q. | Okay.  Would it be fair to say that Mr. Sykes's |
| 6 | | emotional issues or symptoms are something that |
| 7 | | have been longstanding with him and the way he is? |
| 8 | A. | Yes. |
| 9 | Q. | Would it also be fair to say that there's a |
| 10 | | distinction between his emotional issues, the way |
| 11 | | he is, and whether or not he's an intelligent |
| 12 | | person, whether he has mental capacity to |
| 13 | | understand things? |
| 14 | A. | Yes.  I mean, I think if you're looking at things |
| 15 | | that might cause problems for him, certainly it's |
| 16 | | not his intellectual ability and it's not his |
| 17 | | information-processing ability. |
| 18 | Q. | These traits he has, the way he is, such as, you |
| 19 | | know, preoccupation with details or making lists |
| 20 | | or the other things you described that have some |
| 21 | | effect, that could have an effect on some of the |
| 22 | | things he does or the way he does things? |
| 23 | A. | Right.  And I think most of the time in his life |

|    |    |                                                    |
|----|----|----------------------------------------------------|
| 1  |    | it has worked well for him.  I think he's got      |
| 2  |    | himself into situations where that was perfect for |
| 3  |    | him.  I do evaluations of people who want to be    |
| 4  |    | air traffic controllers, and you can't be one if   |
| 5  |    | you have a serious mental illness, but if you have |
| 6  |    | a little bit of OCD, that's okay with them,        |
| 7  |    | because then there's attention to detail and       |
| 8  |    | following protocol and that type of thing, and I   |
| 9  |    | think that's the kind of individual that he is.    |
| 10 | Q. | In other words, for some activities and for some   |
| 11 |    | jobs it's an advantage to have some of these       |
| 12 |    | traits?                                            |
| 13 | A. | Yes.                                               |
| 14 | Q. | Let me ask you this question.  In your opinion do  |
| 15 |    | you think Mr. Sykes has suffered from a mental     |
| 16 |    | illness or impairment that so severely impaired    |
| 17 |    | his ability that he couldn't pursue legal relief   |
| 18 |    | or communicate with lawyers?                       |
| 19 | A. | I think that -- I think that it did.  You know, I  |
| 20 |    | think it's not as obvious or severe as what you    |
| 21 |    | would normally see, but I think that there was     |
| 22 |    | something about this particular situation that     |
| 23 |    | really took him out of his normal functioning      |

```
 1        zone.
 2   Q.   Can you tell us what period of time that occurred?
 3   A.   I think it occurred -- I think when he first --
 4        well, even maybe before, but when he first got,
 5        was aware that something, there was some kind of
 6        wrong charge on his mortgage.
 7   Q.   Do you know over what period of time it lasted and
 8        where it ended?
 9   A.   I think it's still going on.
10   Q.   Do you think that as a result he has an inability
11        to rationally think about issues related to his
12        mortgage?
13   A.   I think that his ability to do that is impaired.
14        I don't think that he has a complete lack of grasp
15        of the issues involved.  I think that he
16        understands in certain ways the broader issues,
17        but seems to get very, very hung up on some of the
18        minutiae to the extent that he simply doesn't take
19        action.
20   Q.   To put it another way, you think that he gets so
21        focused on some of the trees, that he loses sight
22        of the forest?
23   A.   That's exactly what I was thinking.
```

| | | |
|---|---|---|
| 1 | Q. | To continue with that analogy, he can understand |
| 2 | | the forest and understand the forest exists and |
| 3 | | the forest needs to be dealt with, but at times he |
| 4 | | gets so focused on the trees, that he loses sight |
| 5 | | of those things about the forest? |
| 6 | A. | Yes.  And I also think that he's gotten so wound |
| 7 | | up about this that there's been what we refer in |
| 8 | | the business as a little cognitive slippage.  I |
| 9 | | mean, it leaks out occasionally.  I mean, I guess |
| 10 | | it's conceivable that people have been forging his |
| 11 | | signature and impersonating him.  In my experience |
| 12 | | it's unlikely.  I mean, I'm prepared to be told |
| 13 | | I'm wrong about that, but that starts to shade off |
| 14 | | into kind of paranoid thinking about the |
| 15 | | situation.  And one other factor, I think, is this |
| 16 | | business of him always knowing better than the |
| 17 | | people he is going to for assistance. |
| 18 | Q. | Following up on that last trait, would I be |
| 19 | | correct in saying that given Mr. Sykes's |
| 20 | | intelligence level, he can comprehend what someone |
| 21 | | else is telling him, he can comprehend what a |
| 22 | | lawyer is telling him, he just thinks differently |
| 23 | | and believes differently and, therefore, his |

|    |     |                                                       |
|----|-----|-------------------------------------------------------|
| 1  |     | belief is going to control what he does?              |
| 2  | A.  | Yeah.  I think that's pretty accurate.  And I also    |
| 3  |     | think that he's so rigid about his view of the        |
| 4  |     | situation, that being -- when he gets what he          |
| 5  |     | considers to be some bad news about it, he simply      |
| 6  |     | can't assimilate that.                                 |
| 7  | Q.  | And bad news being somebody has a different view       |
| 8  |     | than his view?                                         |
| 9  | A.  | Right.  I mean, it would be as though I went to a      |
| 10 |     | reputable -- I don't know.  I keep coming back to      |
| 11 |     | personal injury -- went to a reputable personal        |
| 12 |     | injury attorney, right, and they told me, "Listen,     |
| 13 |     | Eric, this is worth about $50,000, right?"  And I      |
| 14 |     | said, "No.  By God, it's got to be $5 million."        |
| 15 |     | And it didn't matter how many attorneys I spoke        |
| 16 |     | to, I insisted that it was worth $5 million,           |
| 17 |     | despite reading up and finding out what these          |
| 18 |     | things are generally worth and a consensus of          |
| 19 |     | different people you talk to.  I think there's a       |
| 20 |     | sort of cognitive rigidity that makes it difficult     |
| 21 |     | for him to take direction.                             |
| 22 | Q.  | To follow up on your last analogy, you recognize       |
| 23 |     | that "There was an accident.  I have a claim.          |

| | | |
|---|---|---|
| 1 | | It's a legal claim that I can recover on, but I |
| 2 | | know, based on my review, it's a $5 million claim, |
| 3 | | not a $50,000 claim"? |
| 4 | A. | Right, right. |
| 5 | Q. | Is it your opinion that given his rigidity and his |
| 6 | | strongly-held views on what he perceives occurred, |
| 7 | | that Mr. Sykes really has an agenda in pursuing |
| 8 | | his claim? |
| 9 | A. | Maybe you can clarify that for me a little bit. |
| 10 | Q. | Sure.  You've described various personality traits |
| 11 | | such as rigidity and the fact that his views are |
| 12 | | strongly held and that he sometimes thinks he, for |
| 13 | | lack of a better term, knows better, if you will, |
| 14 | | and wants to right a wrong, and that's an |
| 15 | | important or characteristic of the traits that |
| 16 | | you've seen.  Given all that, do you think that |
| 17 | | Mr. Sykes has an agenda in pursuing his claim?  He |
| 18 | | wants to right the wrong as he sees it? |
| 19 | A. | I think a big piece of this is because of the way |
| 20 | | he's set up.  He wants vindication.  In other |
| 21 | | words, whereas I think most people, maybe they |
| 22 | | struggle with their lawyer a little bit, but might |
| 23 | | say, "Well, look, if that's what it's worth, |

| | | |
|---|---|---|
| 1 | | that's what it's worth. If this is what I can |
| 2 | | recover, that's -- you know, I mean, you're my |
| 3 | | lawyer. I trust you. We developed a |
| 4 | | relationship." I think that he wants this wrong |
| 5 | | righted, and he wants it righted in a way that he |
| 6 | | thinks it should be righted. |
| 7 | | MR. PAPPAS: I'm going to suggest just a |
| 8 | | five-minute break because I need to visit the |
| 9 | | men's room, and I'm going to shift to something |
| 10 | | else. This is a good time to do that. I mean |
| 11 | | typically I -- off the record. |
| 12 | | (Discussion off the record.) |
| 13 | Q. | (BY MR. PAPPAS) Let me just finish up with your |
| 14 | | report, Dr. Mart. On page 8 you state at the end |
| 15 | | of the first paragraph that "At the present time I |
| 16 | | would diagnose him," meaning Mr. Sykes "as |
| 17 | | follows: First with other specified trauma and |
| 18 | | stress-related disorder." Do you see that? |
| 19 | A. | Yes. |
| 20 | Q. | Would you tell us why you made that diagnosis? |
| 21 | A. | That's kind of a diagnosis that's in DSM-5 that |
| 22 | | kind of recognizes that people can be affected by |
| 23 | | negative events but don't necessarily have to be |

| 1 | | in a life-threatening situation.  So his |
|---|---|---|
| 2 | | defensive, avoidance, and hypervigilance, as |
| 3 | | measured by some of the instruments I gave, |
| 4 | | related to an identifiable stressor would seem to |
| 5 | | qualify him for that. |
| 6 | Q. | That diagnosis does not necessarily mean that he |
| 7 | | is mentally incompetent; is that right? |
| 8 | A. | That is correct. |
| 9 | Q. | The second diagnosis was obsessive personality |
| 10 | | disorder.  Can you tell us why you made that |
| 11 | | diagnosis? |
| 12 | A. | Based on the results of my testing and my |
| 13 | | observations and sort of the history of his |
| 14 | | situation, I think that that was the appropriate |
| 15 | | diagnosis because of his rigidity and sort of |
| 16 | | obsessive attention to detail. |
| 17 | Q. | That diagnosis also does not necessarily mean that |
| 18 | | someone is mentally incompetent, correct? |
| 19 | A. | That's correct. |
| 20 | Q. | Someone such as Mr. Sykes can have both of these |
| 21 | | diagnoses and be mentally competent, correct? |
| 22 | A. | Right. |
| 23 | Q. | And in your opinion Mr. Sykes is mentally |

```
 1            competent on the day you examined him?
 2    A.     In a general sense, yes.  I think that most, most
 3            of the domains, like I said, the ones you click
 4            off on the guardian form, he's quite capable of
 5            taking care of himself.
 6    Q.     And always has been?
 7    A.     Yes.
 8    Q.     Now, when you prepared your report and made your
 9            diagnoses and assessments, were you aware whether
10            or not Mr. Sykes had filed complaints to pursue
11            his claims with agencies or persons other than the
12            courts?
13    A.     I think he mentioned that he had talked to like
14            the state commission and other groups that he said
15            were supposed to be helpful in these types of
16            situations.
17    Q.     For instance, did he mention that he filed a
18            complaint with the banks themselves?
19    A.     Yeah.  Yes.  I think I recall that.
20    Q.     Did he mention he filed a complaint with the
21            Office of the Comptroller of the Currency?
22    A.     I don't recall that one, but he may have.
23    Q.     Do you recall that he -- did he mention that he
```

Case 1:13-cv-00334-JD  Document 120-3  Filed 07/02/15  Page 68 of 110

| | | |
|---|---|---|
| 1 | | **filed complaints with, for instance, Senator** |
| 2 | | **Ayotte's office?** |
| 3 | **A.** | **I think he did talk about complaining to various** |
| 4 | | **legislators.** |
| 5 | **Q.** | **I want to -- strike that.** |
| 6 | | **The very last paragraph of your report you** |
| 7 | | **summarize your opinion.  Do you see that?** |
| 8 | **A.** | **Yes.** |
| 9 | **Q.** | **In reaching your opinion and conclusion, did you** |
| 10 | | **rely on any data other than what we've already** |
| 11 | | **discussed in your deposition?** |
| 12 | **A.** | **I think that we pretty much covered it.** |
| 13 | **Q.** | **Would it be also fair to say that we've covered in** |
| 14 | | **your deposition how it is you linked the data and** |
| 15 | | **the symptoms you describe to your opinion?** |
| 16 | **A.** | **Yes.** |
| 17 | **Q.** | **What I want to do finally is just to go through** |
| 18 | | **your file and mark some documents, and to make it** |
| 19 | | **easier I'm going to come around and stand next to** |
| 20 | | **you if you don't mind.** |
| 21 | **A.** | **Sure.** |
| 22 | **Q.** | **The first document looks to be three pages of** |
| 23 | | **handwritten notes.  Are these your notes?** |

|    |    |    |
|----|----|----|
| 1  | A. | Yes. |
| 2  | Q. | And are these notes you took when you interviewed |
| 3  |    | Mr. Sykes? |
| 4  | A. | That's correct. |
| 5  | Q. | So the information in these notes would have been |
| 6  |    | things that Mr. Sykes told you? |
| 7  | A. | I believe so.  There may be some comments and |
| 8  |    | things that I observed as well. |
| 9  |    | MR. PAPPAS:  Could we mark this as the next |
| 10 |    | exhibit. |
| 11 |    | (Exhibit 5 marked.) |
| 12 | A. | This is a continuation of this. |
| 13 | Q. | Ah.  So Exhibit 5 is a continuation of this |
| 14 |    | document in my hand? |
| 15 | A. | Right.  I use a check box to get basic |
| 16 |    | information, and then those are freehand notes. |
| 17 |    | MR. PAPPAS:  Why don't we mark this as |
| 18 |    | Exhibit 5A. |
| 19 |    | (Exhibit 5A marked.) |
| 20 | Q. | Dr. Mart, so that I understand correctly, |
| 21 |    | Exhibit 5A is a form you use when you interviewed |
| 22 |    | Mr. Sykes? |
| 23 | A. | Yes. |

**Mart 6/10/15**

| | | |
|---|---|---|
| 1 | Q. | And Exhibit 5 are some notes you took as part of |
| 2 | | that interview, which are really a continuation of |
| 3 | | your form which is 5A? |
| 4 | A. | Right. |
| 5 | Q. | Okay.  The next document, tell us what that is. |
| 6 | A. | That's just some notes I took while I was speaking |
| 7 | | on the phone to Peter Sykes. |
| 8 | | MR. PAPPAS:  Mark that as the exhibit. |
| 9 | | (Exhibit 6 marked.) |
| 10 | Q. | Let me show you the next document in your file. |
| 11 | | Would you tell us what that is? |
| 12 | A. | Those are some notes I took contemporaneous with |
| 13 | | my conversation with Steve Piro. |
| 14 | Q. | Do you recall whether you took any other notes |
| 15 | | than this one page of notes when you spoke to Mr. |
| 16 | | Piro? |
| 17 | A. | No.  This was just to hit the high points and jog |
| 18 | | my memory. |
| 19 | | MR. PAPPAS:  Okay.  Can we mark that as the |
| 20 | | next exhibit? |
| 21 | | (Exhibit 7 marked.) |
| 22 | Q. | Let me show the next document in your file.  Can |
| 23 | | you tell us what that is? |

**Mart 6/10/15**

69

| | | |
|---|---|---|
| 1 | A. | That's my mental status examination form. |
| 2 | Q. | When would you have filled that out? |
| 3 | A. | Probably while Mr. Sykes was taking one of the |
| 4 | | tests when he's sitting at the computer. |
| 5 | | MR. PAPPAS:  Can we mark that as the next |
| 6 | | exhibit? |
| 7 | | (Exhibit 8 marked.) |
| 8 | Q. | I'm going to show you four documents that are all |
| 9 | | titled, "Authority to Exchange Information." |
| 10 | | Would you just tell us what those are? |
| 11 | A. | These are -- allows me to contact some people |
| 12 | | here:  Peter Sykes, Victor Piro, Lenny Fitzgerald, |
| 13 | | and Glen Johnson. |
| 14 | Q. | And would I be correct in saying that you spoke to |
| 15 | | Peter Sykes; is that correct? |
| 16 | A. | Yes. |
| 17 | Q. | Did you speak to Victor Piro?  Is that Mr. Piro? |
| 18 | A. | Yes. |
| 19 | Q. | And did you speak to Lenny Fitzgerald? |
| 20 | A. | No. |
| 21 | Q. | Did you speak to Glen Johnson? |
| 22 | A. | No. |
| 23 | Q. | Who suggested you speak to Mr. Fitzgerald and Mr. |

1           Johnson?

2   A.      You know, I believe the way that happened was

3           after we were done I said, "Why don't you give my

4           wife releases for people you think I should call,"

5           and there was never really any explanation for who

6           those people were.

7                   MR. PAPPAS:  Mark these as one exhibit.

8                   (Exhibit 9 marked.)

9   Q.      Let me show you a one-page document and ask you to

10          explain to us what that is.

11  A.      That's just the intake form.  That's what people

12          fill out in the waiting room.

13                  MR. PAPPAS:  Mark that as the next exhibit.

14                  (Exhibit 10 marked.)

15  Q.      Let me show you the next document.  Tell us what

16          that is.

17  A.      This is the sort of journal that Mr. Sykes sent

18          along or dropped off called "Day in the Life."

19  Q.      We referred to that earlier in the deposition?

20  A.      Yes.  By the way, I just found the Steve Piro

21          letter.

22  Q.      Is this all one document or --

23  A.      You know, I don't know how that got hooked

|    |     |                                                       |
|----|-----|-------------------------------------------------------|
| 1  |     | together.  Let me see here.  I don't know whether     |
| 2  |     | he included that.  It's not clear to me where         |
| 3  |     | the -- this appears to be by Mr. Piro, but then       |
| 4  |     | there appears to be materials that go on to be --     |
| 5  |     | I think this may be Mr. Sykes.  Maybe there's more    |
| 6  |     | of this in here somewhere.  No.  This -- I don't      |
| 7  |     | know whether this was copied by Mr. Sykes and put     |
| 8  |     | in here as part of this or how this got in here.      |
| 9  |     | It's not signed.  So that's...                        |
| 10 | Q.  | So what we're looking at are loose pages.  The top    |
| 11 |     | of it refers to the lawsuit, and then it refers to    |
| 12 |     | Mr. Piro, and then there's something called           |
| 13 |     | "Introduction" and then "Characteristics of           |
| 14 |     | PTSD/LAS," and then several pages of type.            |
| 15 |     | Sitting here today, is it your understanding that     |
| 16 |     | Mr. Sykes dropped off this material to you?           |
| 17 | A.  | Either dropped off or brought with him.               |
| 18 | Q.  | And do you know who the author of this material       |
| 19 |     | is?                                                   |
| 20 | A.  | Well, these pages here Mr. Piro appears to be         |
| 21 |     | talking about himself in the first person, about     |
| 22 |     | his perceptions, but when we get to this page         |
| 23 |     | here, and they're unnumbered, this does not look     |

```
 1          like something that he would be doing.
 2    Q.    But although this looks to be something that Mr.
 3          Piro may have done, do you know whether or not he
 4          actually drafted it?
 5    A.    I don't.
 6    Q.    So let's do this.  Let's mark these one, two,
 7          three, four pages that you described as looking
 8          like something Mr. Piro would do as the next
 9          exhibit.
10                MS. LASKER:  Off the record.
11                    (Discussion off the record.)
12                    (Exhibit 11 marked.)
13    Q.    And then we have a series of pages that are typed,
14          looks like to be in bullet point form, and we have
15          two pages that start, "Recollections:  A Day in
16          the Life Of."  Do you know if these go together or
17          they're separate?
18    A.    I think that they all came together.
19                MR. PAPPAS:  So why don't we mark all of
20          these as the next exhibit.
21                    (Exhibit 12 marked.)
22    Q.    Then there's a one-page, one-paragraph typed
23          document entitled, "A Timely Statement from
```

73

1       Mr. Steve Piro."  Do you see that?

2  A.   Yes.

3  Q.   Was this a document included with the documents

4       Mr. Sykes provided to you?

5  A.   Yes.

6  Q.   Do you know who drafted this one-page document?

7  A.   I don't, but it looks like -- in other words, I

8       don't think Mr. Piro would say, "Here's a timely

9       statement from Steve Piro," so...

10         MR. PAPPAS:  Why don't we mark that as the

11       next exhibit.

12         (Exhibit 13 marked.)

13  Q.   Let me show you the next document.  Could you tell

14       us what that is?

15  A.   This is the computer scoring of the

16       neuropsychological assessment battery screening

17       module.

18         (Exhibit 14 marked.)

19  Q.   Let me show you the next document.  Could you tell

20       us what that is?

21  A.   This is the record form for when I actually

22       administered the neuropsychological assessment

23       battery.

74

```
 1              MR. PAPPAS:   Please mark that as
 2         Exhibit 15.
 3    A.   If I could mention, there are some test security
 4         issues with that part.
 5              (Exhibit 15 marked.)
 6    Q.   I will put on the record that it's my
 7         understanding that the testimony you've given
 8         today and the documents are limited, we're limited
 9         to showing that to attorneys and any experts that
10         we retain in this matter, and that's the universe
11         of people who can look at this.
12    A.   That would be fine.
13    Q.   Let me show you the next document and ask you what
14         that is.
15    A.   This is the scoring sheet for the Reynolds
16         Adaptive Intelligence Test.
17              MR. PAPPAS:   Can we mark that as
18         Exhibit 16.
19              (Exhibit 16 marked.)
20    Q.   Let me show you the next document and ask you to
21         tell us what that is.
22    A.   This is the scoring sheet for the Trauma Symptom
23         Inventory, second edition.
```

**Mart 6/10/15**

1                     (Exhibit 17 marked.)

2    Q.   Let me show you the next document in your file and

3         ask you to identify that document.

4    A.   That's the printout of the scores of the

5         Personality Assessment Inventory.

6                     MR. PAPPAS:  We can mark that.

7                     (Exhibit 18 marked.)

8    Q.   Let me show you a one-page document and ask you to

9         identify that.

10   A.   That's one of the scoring sheets from the SWAP-200

11        test, just a profile.

12                    (Exhibit 19 marked.)

13   Q.   Let me show you another one-page document.  Please

14        let us know what that is.

15   A.   That's a scoring sheet for the Montreal Cognitive

16        Assessment, which was part of the mental status

17        examination I gave Mr. Sykes.

18                    (Exhibit 20 marked.)

19   Q.   Let me show you another document and ask you to

20        tell us what that is.

21   A.   This is the record sheet for the

22        neuropsychological assessment battery, the part

23        where Mr. Sykes made his own responses to tasks.

76

1               (Exhibit 21 marked.)

2    Q.   And let me show the last document in your file and

3         ask you, is this the subpoena that brought you

4         here today?

5    A.   Yes.

6    Q.   Dr. Mart, have we now marked all of the documents

7         that you brought with you today regarding your

8         work with Mr. Sykes?

9    A.   Yes.

10   Q.   And as I mentioned earlier in the deposition, to

11        the extent that you have any other documents at

12        your office, whether in hard copy or

13        electronically, I'd ask that you provide me with a

14        copy of those in whichever way is easier for you,

15        whether it be electronic or by hard copy.

16   A.   Okay.

17   Q.   Were you paid for your work with Mr. Sykes?

18   A.   I was.

19   Q.   Who paid you?

20   A.   I believe he brought in payment when he came.

21   Q.   And other than that payment, have you received any

22        other payment for working with Mr. Sykes or on Mr.

23        Sykes's matter?

77

1    A.    No.

2    Q.    Okay.  Thank you for your patience.  I'm going to

3          turn the questioning over to someone else.  If I

4          have any follow-up, I'll catch up.

5                EXAMINATION

6    Q.    (BY MR. MURPHY)  I'm Bob Murphy.  I represent the

7          real estate company in the case, New England

8          Coastal Realty.  I just have a few follow-up

9          questions.  And because I'm following up,

10         sometimes I jump around.  So if I get you

11         confused, get us back on track.  Okay?

12   A.    Sure.

13   Q.    I know from your report that when you did your

14         assessment, you applied the criterion of the

15         DSM-5, right?

16   A.    Yes.

17   Q.    Okay.  And that was adopted in 2013?

18   A.    That sounds right.

19   Q.    But in the time of the foreclosure, at the time

20         that Mr. Piro did his work, DSM-IV would have been

21         in place, correct?

22   A.    Yes.

23   Q.    Okay.  Did you compare the criteria for the

| 1 | | diagnoses that you made between the IV and the 5? |
| 2 | A. | Well, there's some slight changes to the PTSD |
| 3 | | criteria in the two volumes, and I don't believe |
| 4 | | that the other trauma-related diagnosis was |
| 5 | | included in 5. |
| 6 | Q. | Okay.  And in terms of the factor that you ruled |
| 7 | | out PTSD on the A-I criteria, those were in effect |
| 8 | | in the DSM-IV, right? |
| 9 | A. | I think both the -- for PTSD, in both of them |
| 10 | | there has to be a perceived threatening event. |
| 11 | Q. | And not just any threatening event; it has to be a |
| 12 | | very specific threatening event? |
| 13 | A. | Right.  Threat to the integrity of your -- fear of |
| 14 | | death, integrity of your body, accident of someone |
| 15 | | in your zone, hearing about a child being killed, |
| 16 | | that type of thing. |
| 17 | Q. | And when you did your evaluation, you determined |
| 18 | | that none of those triggering events had occurred? |
| 19 | A. | That's correct. |
| 20 | Q. | And so it wouldn't have occurred from Mr. Piro |
| 21 | | either, and that's why you believe he made a wrong |
| 22 | | diagnosis? |
| 23 | A. | Correct. |

| | | |
|---|---|---|
| 1 | Q. | Now, you talked a little bit about the |
| 2 | | differential diagnosis, and that's your standard |
| 3 | | operating procedure; isn't that right? |
| 4 | A. | There are cases in which I don't give differential |
| 5 | | diagnoses just because it can be confusing to the |
| 6 | | court. |
| 7 | Q. | But in stress-induced areas the differential |
| 8 | | diagnosis is the way to go? |
| 9 | A. | I think so.  I think you need to have a diagnosis |
| 10 | | to explain to the court what might be going on. |
| 11 | Q. | Okay.  In a lay explanation, a differential |
| 12 | | diagnosis, you're just trying to identify |
| 13 | | potential diagnoses and then screening for those, |
| 14 | | and ruling out the ones that don't apply; is that |
| 15 | | correct? |
| 16 | A. | Right. |
| 17 | Q. | And when you get down to the last one, that's the |
| 18 | | one you diagnose? |
| 19 | A. | Right.  I mean, sometimes it's a close call which |
| 20 | | one fits better. |
| 21 | Q. | Understood.  Understood.  In doing your |
| 22 | | assessment, you came up with a battery of tests |
| 23 | | that you felt were appropriate based upon your |

```
 1           differential diagnosis and what you were

 2           interested in screening for, correct?

 3  A.     I use them in the process of making a differential

 4           diagnosis.

 5  Q.     Understood.  And, for instance, on the NAB, you

 6           made a pretty early determination, based simply on

 7           the screening, that you didn't need to do further

 8           assessment using that instrument, right?

 9  A.     Right.  That that can be used as a freestanding

10           instrument.

11  Q.     Okay.  And in terms of the battery that you

12           ultimately selected, there's a little bit of

13           professional judgment involved in that choice?

14  A.     Sure.

15  Q.     But there's also a pretty standard protocol that

16           you follow as to which tests you're going to

17           administer?

18  A.     I think that probably if you looked at people

19           doing it broadly, these types of assessments,

20           there would be a few instruments that you'd see

21           over and over again.

22  Q.     Okay.  And those are the ones that you used?

23  A.     I think I was kind of an early adopter of the
```

```
 1         Reynolds Adaptable Intellectual Intelligence Test.
 2    Q.   You convinced your peers?
 3    A.   You know, I got a little guff in one case but, you
 4         know, it depends on what you're doing.  In other
 5         words, if it was a case where the man's IQ was
 6         essential and a big part of the case, I probably
 7         would have used a Wechsler.  When you just need a
 8         ballpark estimate that someone is doing okay, I
 9         think there's a lot of tests you can use.
10    Q.   Now, did you use the standard protocols on all the
11         tests you administered?
12    A.   Yes.
13    Q.   You followed the instructions to the letter?
14    A.   Yes.  I mean, the only ones that I actually
15         administered -- actually, the only one that I
16         actually administered was the Neuropsychological
17         Assessment Battery.  One of the advantages of that
18         Reynolds test is you sit the person in front of
19         the computer and say, "Fire away."
20    Q.   I didn't mean to limit my question.  Are these
21         other ones, the SWAP, the MCA, the PAI, the TSI-2,
22         you followed the standard protocols on all those?
23    A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | And all the protocols are in your file? |
| 2 | A. | Yes. |
| 3 | Q. | I tried to keep score, and it sounded like you had |
| 4 | | them marked by Attorney Pappas for each of the |
| 5 | | tests that were administered. |
| 6 | A. | Yes. |
| 7 | Q. | Okay.  You haven't taken out any testing |
| 8 | | materials? |
| 9 | A. | No. |
| 10 | Q. | The ones that are administered on the computer, |
| 11 | | you had printouts of his input on the tests? |
| 12 | A. | Right.  And if I can explain a little bit? |
| 13 | Q. | Sure. |
| 14 | A. | If you've seen other IQ tests, you know, like if |
| 15 | | you do a Wechsler test, there's a booklet where |
| 16 | | you mark down answers, and then there's a scoring |
| 17 | | sheet that you would use either on the front of |
| 18 | | the test or you use a computer program.  Because |
| 19 | | these other programs are administered on a |
| 20 | | computer, there's no other materials.  So they put |
| 21 | | in their responses, you hit the button, you get a |
| 22 | | printout. |
| 23 | Q. | Okay.  And those printouts are in your file? |

1   A.   Yes.

2   Q.   All right.  And these tests that you administered,

3        those are used in all the other mental health

4        practice areas as well, right?

5   A.   Yeah.  They have multiple purposes.

6   Q.   Understood.  But what I mean is an MSW counselor

7        is competent to administer these tests the same as

8        a psychologist?

9   A.   No.

10  Q.   Not to the same level?

11  A.   Not at all.

12  Q.   What do you have to do to be competent to

13       administer these tests?

14  A.   You have to have tests in statistics, test design

15       psychometrics, and specific training to interpret

16       them.

17  Q.   And within your field of psychology, you have to

18       give these tests in order to make a diagnosis;

19       isn't that correct?

20  A.   You know, you don't have to.  I mean, it depends

21       on the situation.  I mean, if someone comes in for

22       psychotherapy, you may not use tests.

23  Q.   Understood.  But you're doing a forensic

1           assessment, right?

2    A.    I think in a forensic assessment you would use

3          objective tests, if for no other reason than to be

4          a check on your clinical judgment.

5    Q.    Well, Standard 9 requires that you have an

6          adequate basis for making this opinion, right?

7    A.    Right.

8    Q.    And an adequate basis in a forensic assessment

9          includes the psychometric testing of some level?

10   A.    You might get some argument from some of my

11         colleagues on that, but almost overwhelmingly

12         there would be testing.

13   Q.    Okay.  And as near as we know from looking at this

14         record, Mr. Piro didn't do any testing, did he?

15   A.    No.

16   Q.    The testing you did was as of the 2014, fall of

17         2014 time frame, correct?

18   A.    Yes.

19   Q.    Mr. Sykes didn't have any psychometric testing in

20         2008, 2009, 2010 that you know about?

21   A.    No.

22   Q.    Now, you did get some records from Mr. Piro, but

23         did you ever get his medical records?

**Mart 6/10/15**

| | | |
|---|---|---|
| 1 | A. | I didn't get his file. |
| 2 | Q. | And Mr. Piro first saw Mr. Sykes in 2010, correct? |
| 3 | A. | Yes. |
| 4 | Q. | Nobody saw him for a mental health assessment in |
| 5 | | 2008 or 2009, correct? |
| 6 | A. | Not to my knowledge. |
| 7 | Q. | So there's really nobody that can testify as to |
| 8 | | his mental health status in 2008, 2009 at all? |
| 9 | A. | Not on the basis of testing or contemporaneous |
| 10 | | assessment, no. |
| 11 | Q. | And everything that we know about his mental |
| 12 | | health status in 2008-2009 is related to somebody |
| 13 | | by Mr. Sykes?  It's based upon his |
| 14 | | representations? |
| 15 | A. | Right.  The only other information was his son, |
| 16 | | although that time frame is a little unclear. |
| 17 | Q. | All right.  And even after Mr. Piro began to see |
| 18 | | Mr. Sykes in 2010, he didn't make a diagnosis of |
| 19 | | PTSD until 2012; is that correct? |
| 20 | A. | Yes. |
| 21 | Q. | So even he didn't think he had PTSD prior to 2012? |
| 22 | A. | That's my understanding. |
| 23 | Q. | Okay.  I'm jumping again, and I want to just take |

**Mart 6/10/15**

| | | |
|---|---|---|
| 1 | | you -- you make a statement on page 8 of your |
| 2 | | report that you went over a little bit with |
| 3 | | Attorney Pappas.  You talk about his -- what you |
| 4 | | observed, and then you say, "It's all associated |
| 5 | | with the loss of his home, livelihood."  I assume |
| 6 | | that's loss of his livelihood? |
| 7 | A. | Yes. |
| 8 | Q. | "And spouse."  And, again, that's the loss of his |
| 9 | | spouse? |
| 10 | A. | Yes. |
| 11 | Q. | And those are all stressors that led to Mr. Sykes' |
| 12 | | stress-induced condition when you saw him; isn't |
| 13 | | that true? |
| 14 | A. | Yes. |
| 15 | Q. | All right.  And he had other stressors that you |
| 16 | | don't mention there; for instance, his discussions |
| 17 | | with the Office of the Currency that you were |
| 18 | | asked about earlier? |
| 19 | A. | I mean, he talked a little bit about all these |
| 20 | | different places he went.  He was a little |
| 21 | | difficult to follow, but I assume that. |
| 22 | Q. | Understood.  But he was unhappy with the result he |
| 23 | | got from the Office of Currency, right? |

| 1 | **A.** | **Very much so.** |
|---|---|---|
| 2 | **Q.** | **He was unhappy with the result he got from the** |
| 3 | | **legislators that he spoke with, right?** |
| 4 | **A.** | **That's correct.** |
| 5 | **Q.** | **And those interactions, and there were others, the** |
| 6 | | **Real Estate Commission and so on, those were all** |
| 7 | | **stressors that led to his condition when you saw** |
| 8 | | **him; isn't that true?** |
| 9 | **A.** | **I'm sure they were contributory.** |
| 10 | **Q.** | **Okay.  And you have no way of differentiating** |
| 11 | | **between all those stressors what was the primary** |
| 12 | | **factor leading to his condition when you assessed** |
| 13 | | **him; is that true?** |
| 14 | **A.** | **No.  I don't think I could point to any one** |
| 15 | | **particular trauma that created any one particular** |
| 16 | | **symptom.** |
| 17 | **Q.** | **Okay.  It was a combination of all of them that** |
| 18 | | **led to your opinion?** |
| 19 | **A.** | **Yes.** |
| 20 | **Q.** | **All right.  It's also true that there may have** |
| 21 | | **been any one or several of them that he had** |
| 22 | | **without resulting in the mental health condition** |
| 23 | | **that you observed when you assessed him in October** |

```
 1        of 2014?
 2   A.   I think that's probably correct.
 3   Q.   So he very may -- I have a wrinkle in my tongue.
 4        I apologize.  I tripped over it.  He may very well
 5        have had some of these stressors prior to you
 6        assessing him that would not have led to the
 7        mental health condition you observed when you did
 8        assess him?
 9   A.   Correct.  I don't know at what point his
10        symptomatology became sufficiently pronounced to
11        qualify for the diagnosis.
12   Q.   I have no other questions.  Thank you.
13                  EXAMINATION
14   Q.   (BY MS. LASKER)  Good afternoon.  I'm Andrea
15        Lasker, and I represent all the Citizens
16        defendants and the Federal National Mortgage
17        Association.  I really have very little to ask, so
18        this will be brief.  With respect to the exhibits
19        that were just noted by Attorney Pappas, and I'm
20        referring specifically to Exhibit 11, Exhibit 12,
21        and Exhibit 13, and I identify Exhibit 11 as the
22        four pages that look like Mr. Piro would have
23        authored; is that correct?
```

| 1 | A. | Yes.  They're the ones that are kind of ambiguous |
| 2 | | as to who's writing what. |
| 3 | Q. | Exhibit 12 I have characterized as the additional |
| 4 | | documents that came along with Exhibit 11, the |
| 5 | | ones that I thought those were the ambiguous; am I |
| 6 | | correct? |
| 7 | A. | Well, there's documentation that seems personal |
| 8 | | from Mr. Sykes, and then several pages in there, |
| 9 | | there was Exhibit 11, which seems to be written by |
| 10 | | Mr. Piro, because it's sort of first person, but |
| 11 | | there's no signature page.  And then it seems to |
| 12 | | go on to very detailed information about finances |
| 13 | | and currency -- |
| 14 | Q. | I understand. |
| 15 | A. | -- so it's... |
| 16 | Q. | Did you review all of those documents? |
| 17 | A. | I looked at -- I recall looking at Mr. Piro's |
| 18 | | report.  Whether it's this part of it or whether I |
| 19 | | have it someplace else, I don't know as I'm |
| 20 | | sitting here.  I did briefly look through this |
| 21 | | material, but it's so involved that it didn't |
| 22 | | really -- I stopped reading it.  It didn't have a |
| 23 | | big impact on my thought process. |

1  Q.  So it's your testimony that those documents,

2  specifically the documents in Exhibit 3 -- excuse

3  me -- 13 did not contribute to the opinion that

4  we've been referring to this afternoon?

5  A.  I think we might be talking about 12.

6  MR. PAPPAS:  12, not 13.

7  Q.  Oh, I'm sorry.  Yes.  12.

8  A.  Right, because it's very detailed discussions of

9  Fannie Mae and Citizens Bank and all kinds of

10  other things, which, A, I don't understand; and,

11  B, it didn't bear directly on my thought process.

12  Q.  I understand.  With respect to those three

13  exhibits, Exhibits 11, 12, and 13, could you

14  clarify as to when Mr. Sykes dropped those off to

15  you?

16  A.  You know, he either brought them with him or came

17  back.  He has a tendency to pop in.

18  Q.  I understand.

19  A.  And he may have -- I can't recall whether he came

20  back and gave them to my wife or whether he gave

21  them to me on that day.

22  Q.  Okay.  But those documents that I'm referring to,

23  they were not provided by Mr. Piro?

| | | |
|---|---|---|
| 1 | A. | No.  I don't think I received -- no.  I know that |
| 2 | | I didn't receive anything directly from Mr. Piro. |
| 3 | Q. | So you received no written documentation |
| 4 | | whatsoever from Mr. Piro at any time? |
| 5 | A. | I'm a little confused about that.  I may have |
| 6 | | received a report through the attorney. |
| 7 | Q. | I understand. |
| 8 | A. | And I think I may have, but he never sent me |
| 9 | | anything directly. |
| 10 | Q. | Okay.  I just want to refer to the last -- your |
| 11 | | summary, the last paragraph of your opinion, which |
| 12 | | says that it is your opinion that Mr. Sykes was |
| 13 | | unable to take the appropriate steps necessary to |
| 14 | | have his case heard in an appropriate venue due to |
| 15 | | a combination of his obsessive personality |
| 16 | | disorder and trauma symptoms. |
| 17 | | Are you stating that it is not your |
| 18 | | professional opinion that the reason that Mr. |
| 19 | | Sykes did not actually file his case in a proper |
| 20 | | venue was not due to a mental incapacity that he |
| 21 | | was suffering at the time that would have been |
| 22 | | appropriate to make those filings? |
| 23 | A. | Well, I think -- I think I am sort of saying that |

```
 1            that was -- that those problems led him to be
 2            unable to do what he needed to do.
 3     Q.     But you don't characterize those problems as a
 4            mental incapacity?
 5     A.     I don't there.  I think, you know, I didn't use
 6            the term capacity.  I think that that was -- that
 7            his problems were the reason that he seemed to be
 8            unable to take appropriate steps.
 9     Q.     Okay.  Nothing further.
10                 EXAMINATION
11     Q.     (BY MR. PAPPAS)  Let me just ask one follow-up
12            question.  When you say "Appropriate venue," what
13            were you referring to?
14     A.     Well, basically getting an attorney, filing
15            whatever he had to file at various points in the
16            process at the appropriate time, and basically
17            being guided by someone who knew what they were
18            doing.
19     Q.     So when you refer to appropriate venue, you
20            weren't thinking of something specific?  You were
21            just thinking generally what should have been
22            done?
23     A.     Right.  I mean, I don't -- I'm not knowledgeable
```

1           enough of the law.  I mean, I would go to an

2           attorney and say, "Listen, what do I do?  I'm

3           going to file here," you know, and that would be

4           the venue that would be appropriate, I guess.

5      Q.   Okay.  We did not mark your subpoena, so let's

6           mark that as the last exhibit.

7                    (Exhibit 22 marked.)

8                    MR. PAPPAS:  I have no other questions.

9           Bob?

10                   MR. MURPHY:  Nothing further.  Thank you.

11                   MR. PAPPAS:  Thank you for your patience.

12          Off the record.

13                   (Discussion off the record.)

14                   MR. PAPPAS:  So we'll do the usual

15          stipulations in New Hampshire, but the time to

16          return the errata sheet will be 14 days.  And I

17          will send the transcript directly to Dr. Mart when

18          I receive it.  Thank you.

19                   (12:53 p.m.)

20

21

22

23

94

Mart 6/10/15

### ERRATA SHEET AND CERTIFICATE OF WITNESS/DEPONENT

In accordance with the rules of procedure governing
depositions, you are entitled to read and correct your
transcript.  Please read your transcript and on this
errata sheet make any necessary corrections or changes,
either in form or substance.  Identify those
corrections/changes by page and line number, stating
the change and the reason.  Please do not mark the
actual transcript.  When completed, date and sign the
errata sheet and have your signature notarized.  (Make
extra copies of this sheet if you need to indicate more
changes or corrections than will fit on this one page.)

I, _____ do hereby certify that I have
read the foregoing transcript of my testimony and
further certify that it is a true and accurate record
of same given on _____ (with the exception of
the following corrections listed below):

Page, Line - Correction & reason for correction
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


Witness/deponent:_____
STATE OF:_____
COUNTY OF: _____
Subscribed and sworn to before me on this _____ day
of _____, 20_____.

_____
Justice of the Peace/Notary Public
My commission expires: _____

95

Mart 6/10/15

## C E R T I F I C A T E

I, Megan M. Hefler, a Licensed Shorthand
Court Reporter (License #61) and Notary Public of
the State of New Hampshire, do hereby certify that
the foregoing, to the best of my knowledge, skill
and ability, is a true and accurate transcript of
my computer-aided electronic stenographic notes of
the deposition of ERIC G. MART, who was duly
sworn, taken at the place and under the
circumstances present on the date hereinbefore set
forth.

I further certify that I am neither
attorney or counsel for, nor related to or
employed by any of the parties to the action in
which this deposition was taken, and further that
I am not a relative or employee of any attorney or
counsel employed in this case, nor am I
financially interested in this action.

_____
Megan M. Hefler, LCR, RDR
Signed 9th this day of June 2015

N.H. LCR No. 61 (RSA 310-A)
My NH Notary Commission expires February 2, 2016

Case 1;13-cv-00334-JD   Document 120-3   Filed 07/02/15   Page 98 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart -  Vol. I
June 10, 2015

## $

**$25,000 (1)**
33:12
**$35,000 (1)**
33:12
**$400 (1)**
27:3
**$5 (3)**
61:14,16;62:2
**$50,000 (2)**
61:13;62:3

## [

**[sic] (1)**
28:13

## A

**abilities (2)**
52:14,19
**ability (7)**
14:11;41:1,3;57:16,
17;58:17;59:13
**able (3)**
38:12;43:10;53:6
**abnormalities (1)**
30:19
**above (4)**
39:14,18;52:13,19
**abstract (1)**
48:21
**Abuse (1)**
28:9
**accident (3)**
45:6;61:23;78:14
**according (3)**
9:8;46:21
**accurate (3)**
47:5;48:12;61:2
**action (1)**
59:19
**activities (1)**
58:10
**activity (1)**
54:19
**actual (1)**
34:21
**actually (7)**
25:3;72:4;73:21;
81:14,15,16;91:19
**Adaptable (1)**
81:1
**Adaptive (2)**
39:12;74:16
**add (2)**
6:17;7:3
**addition (1)**
45:7
**additional (1)**
89:3

**address (4)**
6:5,7;48:7;50:22
**adequate (2)**
84:6,8
**administer (4)**
38:17;80:17;83:7,
13
**administered (12)**
38:15;40:5;43:13;
44:17;73:22;81:11,
15,16;82:5,10,19;83:2
**administering (1)**
40:22
**admit (1)**
40:12
**admitting (1)**
40:11
**adolescence (1)**
49:20
**adopted (1)**
77:17
**adopter (1)**
80:23
**adulthood (3)**
49:20;50:2;55:15
**advantage (1)**
58:11
**advantages (1)**
81:17
**affected (1)**
63:22
**afternoon (2)**
88:14;90:4
**Again (5)**
29:9;37:9;80:21;
85:23;86:8
**agencies (1)**
65:11
**agenda (2)**
62:7,17
**ago (3)**
6:9;20:7;55:14
**agree (1)**
47:1
**agreed (2)**
3:2,5,7
**Ah (1)**
67:13
**A-I (1)**
78:7
**air (1)**
58:4
**al (1)**
11:3
**alasker@harmonlawcom (1)**
2:15.5
**allow (3)**
40:14;42:2;49:1
**allowed (2)**
10:23;11:1
**allowing (1)**
24:21
**allows (1)**

**69:11**
**almost (1)**
84:11
**along (4)**
38:21;46:14;70:18;
89:4
**Although (4)**
31:8;42:22;72:2;
85:16
**always (3)**
55:2;60:16;65:6
**ambiguous (3)**
34:12;89:1,5
**ambivalent (2)**
36:1;37:10
**amended (7)**
3:23;10:22;11:4,8,
10;20:18;50:5
**America (2)**
2:2.5;6:11
**American (1)**
15:3
**analogy (2)**
60:1;61:22
**Andrea (2)**
2:15;88:14
**anxiety (4)**
41:9,12,14,22
**anxiety-related (1)**
41:11
**anymore (1)**
48:4
**apologize (1)**
88:4
**Apparently (2)**
12:17;46:18
**appear (1)**
40:17
**APPEARANCES (1)**
2:1
**appeared (1)**
27:3
**appears (4)**
34:9;71:3,4,20
**applied (1)**
77:14
**apply (1)**
79:14
**appointed (1)**
54:3
**appropriate (10)**
64:14;79:23;91:13,
14,22;92:8,12,16,19;
93:4
**arbitrary (1)**
50:1
**areas (3)**
30:21;79:7;83:4
**argument (2)**
49:4;84:10
**arose (1)**
26:19
**around (5)**

**17:22;31:9;56:13;**
**66:19;77:10**
**art (1)**
27:8
**assess (3)**
41:2;54:10;88:8
**assessed (2)**
87:12,23
**assessing (1)**
88:6
**Assessment (26)**
5:7.5;15:7;16:13;
39:7,17;40:5;41:23;
43:14,17;44:19,20;
45:5;73:16,22;75:5,
16,22;77:14;79:22;
80:8;81:17;84:1,2,8;
85:4,10
**assessments (3)**
45:2;65:9;80:19
**assimilate (1)**
61:6
**assist (2)**
38:12;47:21
**assistance (3)**
36:19;37:8;60:17
**assisting (2)**
35:11;36:12
**associated (2)**
48:8;86:4
**Association (3)**
2:12.5;15:4;88:17
**assume (5)**
6:19;21:16;22:15;
86:5,21
**assuming (1)**
48:11
**assumption (1)**
11:21
**attach (1)**
43:10
**attempt (2)**
24:9;29:17
**attempting (1)**
26:9
**attempts (3)**
33:15;42:14;44:3
**attention (2)**
58:7;64:16
**attentional (1)**
52:17
**Attorney (25)**
5:10.5;9:1,3,17;
11:11,22;12:1,6,15;
22:9;29:19,20;50:13;
51:3,5,7;52:3;53:19;
61:12;82:4;86:3;
88:19;91:6;92:14;
93:2
**attorneys (7)**
6:12;36:11,22;51:8,
11;61:15;74:9
**author (2)**

**10:8;71:18**
**authored (1)**
88:23
**Authority (3)**
4:12.5;20:12;69:9
**average (7)**
39:14,14,17,18;
52:14,19,19
**avoidance (2)**
42:14;64:2
**aware (9)**
26:6,12,20;53:14;
54:1,5,15;59:5;65:9
**away (1)**
81:19
**awhile (1)**
14:14
**Axis (1)**
43:20
**Ayotte's (1)**
66:2

## B

**back (12)**
9:13;12:20;18:8;
19:1;23:6;27:11;
37:11;42:3;61:10;
77:11;90:17,20
**bad (3)**
29:1;61:5,7
**balance (1)**
48:2
**ballpark (1)**
81:8
**Bank (5)**
2:2.5,2.5;6:10,11;
90:9
**banks (1)**
65:18
**bar (1)**
54:11
**Based (8)**
27:2;28:3;31:23;
62:2;64:12;79:23;
80:6;85:13
**basic (2)**
46:9;67:15
**basically (7)**
12:23;30:20;41:19;
48:19;51:17;92:14,16
**basis (3)**
84:6,8;85:9
**basket (1)**
45:21
**battery (8)**
39:7,17;73:16,23;
75:22;79:22;80:11;
81:17
**bear (1)**
90:11
**bearing (1)**
31:2

Case 1:13-cv-00334-JD   Document 120-3   Filed 07/02/15   Page 99 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**became (8)**
25:10,14,15;26:6,
12,20;28:10;88:10
**becomes (3)**
27:7;47:11;49:7
**began (5)**
25:6;26:8;27:4;
51:19;85:17
**behavior (3)**
19:20;30:20;39:4
**belief (1)**
61:1
**believes (1)**
60:23
**belonged (1)**
27:4
**better (5)**
40:16;60:16;62:13,
13;79:20
**big (4)**
55:21;62:19;81:6;
89:23
**bill (1)**
33:14
**billing (1)**
20:9
**biographical (1)**
21:3
**bit (10)**
30:7;47:22;58:6;
62:9,22;79:1;80:12;
82:12;86:2,19
**blamed (1)**
24:20
**blocking (1)**
8:23
**boards (2)**
34:4,16
**Bob (2)**
77:6;93:9
**body (1)**
78:14
**booklet (1)**
82:15
**both (3)**
64:20;78:9,9
**bothering (1)**
43:6
**bottom (1)**
32:21
**box (1)**
67:15
**break (2)**
41:15;63:8
**breaks (1)**
56:22
**breakup (2)**
24:17,23
**breath (1)**
41:20
**brief (2)**
13:18;88:18
**briefly (1)**

89:20
**broader (1)**
59:16
**broadly (1)**
80:19
**brought (7)**
9:10;21:1;71:17;
76:3,7,20;90:16
**build (1)**
44:8
**bullet (1)**
72:14
**business (2)**
60:8,16
**button (1)**
82:21

**C**

**California (1)**
2:14
**call (5)**
13:2;43:20;45:2;
70:4;79:19
**called (5)**
11:22;12:6,16;
70:18;71:12
**came (14)**
11:20;12:22;13:4,5;
16:17;28:8;35:2;
36:21;72:18;76:20;
79:22;89:4;90:16,19
**can (36)**
8:23;10:5;14:1;
21:21;23:10;27:22;
28:18;29:1;30:7,22;
33:16;41:5;44:7;48:1;
53:8;59:2;60:1,20,21;
62:1,9;63:1,22;64:10,
20;68:19,22;69:5;
74:11,17;75:6;79:5;
80:9;81:9;82:12;85:7
**candle (1)**
31:9
**capable (1)**
65:4
**capacities (1)**
14:9
**capacity (19)**
14:7,17,21;15:6,8;
46:6,8,12,13,18;
48:16;54:6,9,16,19,
22;55:3;57:12;92:6
**caption (1)**
3:5
**captioned (2)**
10:22;11:2
**car (2)**
45:6,6
**care (2)**
53:9;65:5
**career (1)**
14:10

**Carolina (1)**
2:9
**case (21)**
6:11;9:18;11:2;
13:8,11,20;14:13,15;
36:1,2;40:21;45:21;
46:5,17;51:19;77:7;
81:3,5,6;91:14,19
**cases (5)**
8:10;14:10;40:21;
45:16;79:4
**catch (1)**
77:4
**category (2)**
39:14,18
**causal (1)**
43:11
**cause (3)**
56:17,18;57:15
**causes (1)**
56:17
**causing (1)**
41:23
**CCO (1)**
2:12
**certain (4)**
42:15;45:1,3;59:16
**certainly (1)**
57:15
**chance (2)**
7:2,5
**change (1)**
9:8
**changes (1)**
78:2
**chapter (1)**
15:2
**characteristic (1)**
62:15
**Characteristics (1)**
71:13
**characterize (1)**
92:3
**characterized (1)**
89:3
**charge (3)**
27:3;33:14;59:6
**Charlotte (1)**
2:9
**check (4)**
23:7;54:22;67:15;
84:4
**checkbook (2)**
48:2,4
**child (2)**
31:9;78:15
**children (1)**
7:12
**choice (1)**
80:13
**circumstance (1)**
46:3
**circumstances (4)**

9:9,18;12:5;35:12
**circumstantial (1)**
27:8
**circumstantiality (2)**
31:12,20
**Citizens (4)**
2:12,5;11:3;88:15;
90:9
**civil (3)**
14:9;15:5;48:1
**claim (6)**
61:23;62:1,2,3,8,17
**claims (1)**
65:11
**clarify (3)**
6:23;62:9;90:14
**classifications (1)**
55:23
**clear (8)**
18:7;22:8;25:16;
27:6;34:19;37:4;
43:23;71:2
**click (1)**
65:3
**client (1)**
4:14
**Clinical (3)**
4:7;32:9;84:4
**clinician (1)**
43:5
**close (2)**
28:22;79:19
**clothing (1)**
53:16
**Coastal (2)**
2:17;77:8
**co-authored (1)**
15:2
**Cognitive (9)**
5:7;39:9,22;41:1,2;
52:20;60:8;61:20;
75:15
**collateral (1)**
23:14
**colleagues (1)**
84:11
**combination (2)**
87:17;91:15
**coming (2)**
45:22;61:10
**comments (1)**
67:7
**commission (2)**
65:14;87:6
**communicate (1)**
58:18
**company (1)**
77:7
**compare (1)**
77:23
**competence (1)**
32:6
**competencies (1)**

15:5
**competent (6)**
3:4;49:2;64:21;
65:1;83:7,12
**complaining (1)**
66:3
**complaint (11)**
3:23;10:23;11:4,9,
10,15;20:18;50:5;
52:1;65:18,20
**complaints (2)**
65:10;66:1
**complete (3)**
6:23;7:4;59:14
**completed (2)**
16:21;17:2
**completely (1)**
22:7
**complex (1)**
22:1
**complicated (1)**
22:2
**comport (1)**
22:6
**comprehend (2)**
60:20,21
**Comptroller (1)**
65:21
**compulsive (1)**
55:19
**computer (9)**
23:5,7,8;69:4;
73:15;81:19;82:10,
18,20
**conceivable (1)**
60:10
**concentrate (1)**
45:18
**concerned (1)**
42:12
**concerns (1)**
21:4
**conclude (2)**
32:3;40:8
**conclusion (2)**
52:9;66:9
**conclusions (1)**
55:5
**condition (6)**
56:19;86:12;87:7,
12,22;88:7
**conditions (1)**
55:23
**conduct (1)**
30:4
**conducted (1)**
23:14
**confidentiality (1)**
19:16
**confirm (1)**
17:1
**confused (2)**
77:11;91:5

Case 1:13-cv-00334-JD   Document 120-3   Filed 07/02/15   Page 100 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**confusing (1)**
79:5
**conscious (1)**
42:14
**consciousness (1)**
42:16
**consensus (1)**
61:18
**consent (1)**
54:19
**considered (1)**
49:2
**considers (2)**
44:4;61:5
**consistent (1)**
43:4
**constricted (1)**
44:7
**contact (1)**
69:11
**contacted (3)**
12:1;35:9;36:12
**contain (1)**
16:10
**contained (1)**
23:2
**contains (2)**
22:20;24:5
**contemporaneous (2)**
68:12;85:9
**content (1)**
30:18
**continuation (3)**
67:12,13;68:2
**continue (2)**
37:5;60:1
**Continued (2)**
4:1.5;5:2
**contours (1)**
51:19
**contract (1)**
14:11
**contractor (1)**
33:9
**contribute (1)**
90:3
**contributory (1)**
87:9
**control (3)**
13:1;47:11;61:1
**controllers (1)**
58:4
**convenient (1)**
23:10
**conversation (7)**
4:8.5,10;24:4;30:2;
31:4;35:18;68:13
**conversations (1)**
26:5
**convinced (1)**
81:2
**cop (1)**
47:18

**cope (1)**
44:3
**copied (1)**
71:7
**copy (10)**
7:14;8:2,5;11:4,10;
15:23;23:9;76:12,14,
15
**Corporation (1)**
2:12
**correctly (2)**
25:16;67:20
**counsel (4)**
3:7.5;8:22;17:9;
36:19
**counseling (1)**
25:4;28:5,6
**counselor (1)**
83:6
**couple (2)**
12:11,22
**course (2)**
15:5;31:4
**Court (9)**
2:21.5,22.5;3:6;
8:12;10:23;17:13;
47:19;79:6,10
**courts (2)**
48:6;65:12
**cover (1)**
17:20
**covered (3)**
15:4;66:12,13
**covers (1)**
11:15
**CRAMER (1)**
2:4.5
**created (2)**
49:13;87:15
**criteria (5)**
28:17,18;77:23;
78:3,7
**criterion (1)**
77:14
**Currency (4)**
65:21;86:17,23;
89:13
**current (3)**
7:17;8:5;33:2
**Curriculum (1)**
3:20
**CV (2)**
7:15;8:2

**D**

**D7 (1)**
6:7
**data (2)**
66:10,14
**date (10)**
12:14;16:13,16,17,
20,21;18:16,19,22;

19:3
**dated (2)**
10:12;11:2
**Day (12)**
4:16.5;18:12;21:2,
9;44:19;45:15;53:8,8;
65:1;70:18;72:15;
90:21
**days (2)**
3:7.5;93:16
**deadline (9)**
35:3,14;36:8,8;
50:17;51:21,22;52:4,
6
**deal (3)**
37:7,17;38:5
**dealt (1)**
60:3
**death (1)**
78:14
**decisions (1)**
54:20
**deemed (1)**
32:14
**defendants (2)**
6:12;88:16
**defensive (5)**
40:9;41:5;42:13;
45:23;64:2
**delay (1)**
47:16
**dementia (1)**
39:1
**demographic (1)**
4:14.5
**depended (1)**
11:19
**depends (2)**
81:4;83:20
**deponent (2)**
3:8,11
**deposes (1)**
6:2
**deposition (13)**
3:2.5,7;8:12,14;
11:13;13:1,6,15;16:2;
66:11,14;70:19;76:10
**depositions (2)**
3:3.5;6:17
**depressed (1)**
35:22
**depression (1)**
56:5
**derived (1)**
48:18
**describe (2)**
55:11;66:15
**described (6)**
33:1;34:16;49:16;
57:20;62:10;72:7
**describes (1)**
35:12
**describing (1)**

36:7
**Description (5)**
3:19;4:3;5:4;24:3;
47:20
**descriptions (1)**
43:5
**design (1)**
83:14
**despite (2)**
46:20;61:17
**detail (2)**
58:7;64:16
**detailed (2)**
89:12;90:8
**details (1)**
57:19
**determination (1)**
80:6
**determine (3)**
14:16;39:7;43:2
**determined (3)**
39:12,20;78:17
**developed (2)**
56:5;63:3
**diagnose (3)**
49:22;63:16;79:18
**diagnosed (1)**
55:8
**diagnoses (5)**
64:21;65:9;78:1;
79:5,13
**diagnosing (1)**
14:6
**diagnosis (22)**
28:12,14;31:1;
32:15;63:20,21;64:6,
9,11,15,17;78:4,22;
79:2,8,9,12;80:1,4;
83:18;85:18;88:11
**diagnostic (1)**
28:17
**die (1)**
28:21
**difference (1)**
55:21
**different (12)**
21:22;34:3;38:21;
41:14;44:2;51:6;
55:17,19;57:3;61:7,
19;86:20
**differential (6)**
79:2,4,7,11;80:1,3
**differentiating (1)**
87:10
**differently (2)**
60:22,23
**difficult (6)**
21:23;33:17;47:12;
51:20;61:20;86:21
**difficulties (3)**
19:1;35:22;36:20
**difficulty (4)**
19:6;26:15;49:6;

51:15
**dig (1)**
9:11
**Diplomate (1)**
2:22
**direction (2)**
49:7;61:21
**directly (5)**
54:10;90:11;91:2,9;
93:17
**discouraged (1)**
29:19
**discover (2)**
22:9;40:23
**discuss (1)**
13:20
**discussed (4)**
13:15;19:8,11;
66:11
**discussing (3)**
13:13,15;25:7
**Discussion (7)**
7:21;14:3;26:4;
51:3;63:12;72:11;
93:13
**discussions (5)**
13:3,18;28:3;86:16;
90:8
**disorder (8)**
44:1;49:23;55:18,
20,22;63:18;64:10;
91:16
**disorders (5)**
41:11;43:20,20;
44:15;56:10
**distinction (1)**
57:10
**distress (2)**
45:8,12
**disturbing (1)**
42:15
**doctor (3)**
30:13;56:7,23
**document (27)**
4:18.5;10:21;20:19;
21:2,7;22:2;66:22;
67:14;68:5,10,22;
70:9,15,22;72:23;
73:3,6,13,19;74:13,
20;75:2,3,8,13,19;
76:2
**documentation (5)**
20:19;23:1;50:14;
89:7;91:3
**documents (22)**
4:7.5,15.5,17;20:17,
22,23;21:15;22:14,
19;27:14;51:18;
66:18;69:8;73:3;74:8;
76:6,11;89:4,16;90:1,
2,22
**domains (1)**
65:3

Case 1:13-cv-00334-JD   Document 120-3   Filed 07/02/15   Page 101 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**done (13)**
10:13;14:19,23;
16:8;17:1,4;44:9;
46:6;49:8,9;70:3;
72:3;92:22
**down (5)**
19:6;37:3;47:12;
79:17;82:16
**Dr (9)**
3:20.5;6:9;7:22;
14:5;20:5;63:14;
67:20;76:6;93:17
**drafted (2)**
72:4;73:6
**draw (1)**
42:3
**dread (1)**
41:18
**dropped (6)**
21:1,8;70:18;71:16,
17;90:14
**drunk (1)**
36:17
**DSM-5 (3)**
28:19;63:21;77:15
**DSM-IV (3)**
28:19;77:20;78:8
**due (2)**
91:14,20
**duly (1)**
6:1
**during (4)**
8:10;17:14;34:6;
53:14
**dynamics (2)**
46:9,20
**dysfunction (1)**
39:22

**E**

**earlier (4)**
50:17;70:19;76:10;
86:18
**early (5)**
49:20;50:2;55:15;
80:6,23
**easier (2)**
66:19;76:14
**eczema (1)**
30:13
**edition (1)**
74:23
**educated (1)**
47:14
**effect (3)**
57:21,21;78:7
**EGGLESTON (1)**
2:4.5
**ego-alien (1)**
56:1
**ego-syntonic (2)**
56:2,10

**eight (1)**
14:10
**eireland@winstoncom (1)**
2:10
**either (12)**
8:11;13:3;15:10;
23:9;39:14;43:2;
44:19;51:3;71:17;
78:21;82:17;90:16
**electronic (1)**
76:15
**electronically (1)**
76:13
**elevate (1)**
42:23
**elevation (4)**
41:10;42:11,13,17
**elevations (2)**
41:6;43:3
**elicit (1)**
36:13
**Elizabeth (2)**
2:9.5;6:10
**Elm (1)**
2:5
**else (7)**
10:18;29:15;30:15;
60:21;63:10;77:3;
89:19
**e-mail (1)**
23:10
**emotional (5)**
41:17;55:6,9;57:6,
10
**emotionally (1)**
44:7
**end (2)**
35:2;63:14
**ended (1)**
59:8
**England (2)**
2:17;77:7
**enough (4)**
12:18;40:13;42:22;
93:1
**enter (1)**
14:11
**entire (1)**
7:22
**entirely (2)**
21:18;33:20
**entitled (5)**
20:16;21:2,8;32:8;
72:23
**entry (1)**
28:18
**episode (1)**
56:23
**equally (2)**
46:23;47:15
**Eric (4)**
3:12;6:1,6;61:13
**Errata (1)**

3:16;93:16
**Esq (4)**
2:6,9.5,15,19.5
**essential (1)**
81:6
**estate (2)**
77:7;87:6
**estimate (1)**
81:8
**et (1)**
11:3
**evaluate (2)**
8:21;10:16
**evaluated (1)**
18:5
**evaluating (1)**
21:10;24:6
**evaluation (11)**
11:20;17:12;19:8;
22:13,22;29:11;
45:10;50:20;52:5,13;
78:17
**evaluations (1)**
58:3
**even (6)**
21:23;48:3;50:9;
59:4;85:17,21
**event (5)**
42:4;43:11;78:10,
11,12
**events (2)**
63:23;78:18
**eventually (2)**
27:11;50:11
**everybody (1)**
6:19
**evidence (3)**
44:18;46:11;54:1
**exact (3)**
12:4,14;29:22
**exactly (2)**
17:19;59:23
**exaggerate (1)**
45:16
**exam (1)**
4:11.5
**Examination (12)**
3:13,14,15;6:3;
9:19;30:4,5;69:1;
75:17;77:5;88:13;
92:10
**examined (1)**
65:1
**examining (1)**
10:2
**example (1)**
33:21
**except (2)**
3:5.5;57:2
**Exchange (3)**
4:12.5;20:12;69:9
**excuse (1)**
90:2

**executive (1)**
52:18
**Exhibit (84)**
3:20,21.5,22.5;
4:4.5,5,5,7,8.5,10,
11.5,12.5,14,15.5,
16.5,18,19.5,21,22,23;
5:5,6,7,8.5,9.5,8,8,9;
10:5,6,7,17;11:6,7,8;
16:4,7;20:3,4,6;22:4,
5;49:19;50:5;67:10,
11,13,18,19,21;68:1,
8,9,20,21;69:6,7;70:7,
8,13,14;72:9,12,20,
21;73:11,12,18;74:2,
5,18,19;75:1,7,12,18;
76:1;88:20,20,21,21;
89:3,4,9;90:2;93:6,7
**exhibited (2)**
41:12;44:20
**Exhibits (4)**
5:10.5;88:18;90:13,
13
**exists (1)**
60:2
**expect (1)**
45:15
**experience (5)**
14:6;28:20,22,23;
60:11
**experienced (1)**
21:20
**expert (2)**
11:17;12:2;13:7,10
**experts (1)**
74:9
**explain (6)**
30:7;45:11;55:18;
70:10;79:10;82:12
**explained (2)**
33:1;46:21
**explanation (3)**
46:23;70:5;79:11
**express (1)**
44:11
**extent (9)**
12:19;40:10;44:22;
47:10;48:23;49:11;
50:22;59:18;76:11
**extreme (1)**
57:3
**ex-wife (1)**
29:18

**F**

**fabricated (1)**
27:13
**face (4)**
19:15,15;23:22,22
**fact (5)**
12:4;47:13,21;49:7;
62:11

**factor (2)**
60:15;78:6;87:12
**facts (1)**
48:11
**fair (4)**
31:23;57:5,9;66:13
**fall (1)**
84:16
**false (1)**
22:11
**familiar (2)**
6:16;53:21
**family (1)**
35:6
**Fannie (1)**
90:9
**fashion (2)**
36:15;45:20
**fast (1)**
12:18
**fear (2)**
28:23;78:13
**Federal (2)**
2:12;88:16
**fee (1)**
20:9
**feel (4)**
44:9;45:7;56:5,9
**feelings (1)**
42:16
**feels (1)**
49:8
**fell (1)**
45:17
**felt (3)**
11:22;35:6;79:23
**few (4)**
14:8;23:13;77:8;
80:20
**field (1)**
83:17
**file (26)**
7:22;8:2,5,19;9:10;
10:22;12:17;13:13,
14;17:18;19:12,21;
23:2;51:22;52:4;
66:18;68:10,22;75:2;
76:2;82:1,23;85:1;
91:19;92:15;93:3
**filed (5)**
36:18;65:10,17,20;
66:1
**filing (4)**
3:5;35:3;50:11;
92:14
**filings (1)**
91:22
**fill (1)**
70:12
**filled (1)**
69:2
**fills (1)**
28:23

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**finally (3)**
15:17;50:12;66:17
**finances (2)**
53:11;89:12
**find (1)**
10:1
**finder (1)**
47:21
**finding (3)**
19:22;51:16;61:17
**fine (1)**
74:12
**finish (1)**
63:13
**Fire (1)**
81:19
**fired (1)**
36:22
**first (20)**
3:3;6:1;12:12,14;
17:7,11;19:12;20:17;
23:14,19;24:8;27:20;
59:3,4;63:15,17;
66:22;71:21;85:2;
89:10
**fits (1)**
79:20
**Fitzgerald (3)**
69:12,19,23
**five-minute (1)**
63:8
**flavor (1)**
21:12
**flavors (1)**
41:15
**Floor (2)**
2:5,8.5
**flu (1)**
56:8
**focus (5)**
25:11,14,15;28:6,
10
**focused (2)**
59:21;60:4
**focusing (1)**
25:7
**follow (4)**
21:5;61:22;80:16;
86:21
**followed (2)**
81:13,22
**following (3)**
58:8;60:18;77:9
**follows (2)**
6:2;63:17
**follow-up (3)**
77:4,8;92:11
**food (1)**
53:16
**foreclosed (5)**
26:21;27:19;34:17;
37:22;38:3
**foreclosure (8)**

24:15;25:7,22;
34:21;37:7,17;38:6;
77:19
**Forensic (4)**
15:2;83:23;84:2,8
**forest (5)**
59:22;60:2,2,3,5
**forging (1)**
60:10
**form (19)**
3:5,5;4:4,5,11.5,14,
21;19:12,13,21;20:6,
9;31:21;54:23;65:4;
67:21;68:3;69:1;
70:11;72:14;73:21
**formalities (1)**
3:5
**forms (1)**
4:13
**forth (4)**
12:20;32:1;37:11;
49:16
**found (3)**
22:5;40:2;70:20
**four (5)**
8:11;15:16;69:8;
72:7;88:22
**frame (3)**
19:2;84:17;85:16
**free (1)**
8:19
**freehand (1)**
67:16
**freestanding (1)**
80:9
**friend (1)**
56:12
**front (3)**
16:5;81:18;82:17
**full (1)**
6:4
**function (3)**
45:19;52:18;53:8
**functioning (1)**
52:21;57:4;58:23
**furniture (1)**
35:8
**further (4)**
3:7;80:7;92:9;
93:10

**G**

**Galen (1)**
6:6
**gather (1)**
18:1
**gave (10)**
18:5,12;21:11;
27:16;38:13;39:4;
64:3;75:17;90:20,20
**geared (1)**
44:15

**general (5)**
21:11;43:5,9;46:10;
65:2
**generally (7)**
38:17;44:6;53:7;
56:10,16;61:18;92:21
**germane (1)**
21:6
**gets (3)**
59:20;60:4;61:4
**given (7)**
7:1,15;47:13;60:19;
62:5,16;74:7
**gives (1)**
27:9
**giving (1)**
39:11
**Glen (2)**
69:13,21
**God (1)**
61:14
**goes (1)**
46:14
**good (9)**
27:17,23;29:18,21;
34:14;37:13;46:2;
63:10;88:14
**grasp (1)**
59:14
**Grisso (1)**
48:22
**Grisso's (1)**
48:19
**group (2)**
56:1,2
**groups (1)**
65:14
**guardian (3)**
53:12;54:3;65:4
**guardianship (4)**
53:21;54:17,21,23
**guess (5)**
33:19;47:18;49:4;
60:9;93:4
**guff (1)**
81:3
**guided (1)**
92:17

**H**

**Hampshire (7)**
2:5.5,19;3:4;6:8;
35:5;54:15;93:15
**hand (1)**
67:14
**Handbook (1)**
15:2
**handle (2)**
37:12;51:16
**handling (1)**
53:10
**Handwritten (2)**

4:5.5;66:23
**happen (1)**
29:1
**happened (1)**
70:2
**happening (1)**
48:10
**happens (1)**
47:3
**hard (4)**
21:5;23:9;76:12,15
**hardware (2)**
40:1;41:1
**Harman (9)**
9:1,3,17;12:6,15;
51:3,5,7;52:3
**Harman's (1)**
50:13
**HARMON (1)**
2:13.5
**headache (1)**
30:12
**health (7)**
53:17;83:3;85:4,8,
12;87:22;88:7
**hear (1)**
47:6
**heard (2)**
12:6;91:14
**hearing (2)**
45:5;78:15
**Hefler (1)**
2:21.5
**held (1)**
62:12
**help (2)**
31:21;50:20
**helpful (3)**
16:5;50:20;65:15
**Here's (1)**
73:8
**high (2)**
42:22;68:17
**higher (1)**
41:7
**himself (9)**
26:9;29:16;36:5;
37:12;40:19;53:9;
58:2;65:5;71:21
**hire (1)**
50:16
**history (2)**
32:18;64:13
**hit (4)**
45:6,17;68:17;
82:21
**hold (1)**
34:13
**home (6)**
24:16;25:8,23;35:7,
9;86:5
**honest (1)**
40:12

**Honey (1)**
27:19
**hooked (1)**
70:23
**hope (1)**
56:2
**hours (1)**
26:8
**house (10)**
26:21;33:6,9;34:1,
17;37:8,18,22;38:3,6
**houses (1)**
34:16
**hung (1)**
59:17
**hyperarousal (1)**
42:11
**hypervigilance (1)**
64:2
**hypervigilant (1)**
42:17
**hypotheses (2)**
31:22;38:21

**I**

**idea (3)**
29:21;54:12;56:3
**identifiable (1)**
64:4
**identified (1)**
20:23
**identifies (1)**
20:17
**identify (6)**
20:19;21:15;75:3,9;
79:12;88:21
**identifying (1)**
25:20
**identity (1)**
56:16
**illness (3)**
32:18;58:5,16
**immediately (2)**
32:5,7
**impact (1)**
89:23
**impaired (3)**
32:4;58:16;59:13
**impairment (1)**
58:16
**impediment (1)**
49:10
**impersonated (1)**
34:5
**impersonating (1)**
60:11
**implied (1)**
36:20
**important (6)**
21:13;22:21;24:5;
29:11;32:15;62:15
**impression (7)**

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

27:15;37:6,16,21;
38:2,9,13
**inability (2)**
33:16;59:10
**inappropriate (2)**
19:19;36:19
**Inc (1)**
2:17
**incapacity (2)**
91:20;92:4
**included (4)**
15:8;71:2;73:3;
78:5
**includes (1)**
84:9
**incompetence (3)**
31:18;47:23;48:1
**incompetency (3)**
44:21;47:17;48:14
**incompetent (5)**
32:3;35:20;36:9;
64:7,18
**incorrect (2)**
28:14;33:14
**indexes (1)**
40:14
**indicate (2)**
19:7;52:13
**indicated (2)**
23:15;43:6
**indicates (1)**
52:17
**indications (1)**
41:8
**indicative (1)**
52:20
**individual (3)**
25:19;35:23;58:9
**individually (1)**
25:10
**individuals (1)**
27:13
**ineffective (2)**
35:10;36:12
**info (1)**
4:14.5
**Information (22)**
4:13;17:6,7,13;
19:7,14;20:13;21:14,
16;22:20;23:7;24:5;
27:10;29:12;32:13;
50:21;51:14;67:5,16;
69:9;85:15;89:12
**information-processing (1)**
57:17
**initial (2)**
24:23;31:22
**initially (1)**
37:2
**initiated (2)**
50:3,6
**injunction (1)**
27:22

**injured (1)**
28:21
**injuries (1)**
45:7
**injury (2)**
61:11,12
**input (1)**
82:11
**insight (3)**
31:7;46:8,11
**insisted (1)**
61:16
**instance (5)**
3:3;65:17;66:1;
80:5;86:16
**instructions (1)**
81:13
**instrument (2)**
80:8,10
**instruments (2)**
64:3;80:20
**intact (1)**
31:10
**intake (4)**
4:4.5,14;19:13;
70:11
**integrity (2)**
78:13,14
**intellectual (3)**
52:14;57:16;81:1
**Intelligence (8)**
39:12;60:20;74:16;
81:1
**intelligent (5)**
39:13;40:3;47:13;
53:2;57:11
**intelligently (1)**
48:15
**interaction (1)**
51:10
**interactions (1)**
87:5
**interested (1)**
80:2
**Internet (1)**
26:8
**interpret (2)**
41:6;83:15
**interview (6)**
4:6;29:15;32:9,10,
14;68:2
**interview/history (1)**
4:7
**interviewed (4)**
37:23;38:4;67:2,21
**interviews (1)**
23:14
**into (6)**
14:11;27:6;31:7;
46:9;58:2;60:14
**introduce (1)**
6:13
**Introduction (1)**

71:13
**invalidate (1)**
40:13
**inventory (4)**
40:6;42:6;74:23;
75:5
**inviting (1)**
30:15
**involved (9)**
22:3;27:9,15;37:18;
38:6;54:18;59:15;
80:13;89:21
**IQ (4)**
39:5,11;81:5;82:14
**Ireland (2)**
2:9.5;6:10
**irritation (1)**
44:12
**issue (6)**
14:19,20;27:16;
37:18;38:7;54:20
**issues (13)**
24:16;25:8;28:6;
48:20;50:23;54:14;
55:9;57:6,10;59:11,
15,16;74:4
**items (1)**
55:3
**IV (1)**
78:1

## J

**jobs (1)**
58:11
**jog (1)**
68:17
**Johnson (3)**
69:13,21;70:1
**journal (1)**
70:17
**Jr (2)**
2:19.5;11:3
**judge (1)**
34:12
**judgment (3)**
31:8;80:13;84:4
**judgmental (1)**
44:8
**jump (1)**
77:10
**jumping (1)**
85:23
**jumpy (3)**
41:21;42:12,17

## K

**keep (5)**
33:17;42:15,20;
61:10;82:3
**kept (1)**
34:8

**killed (1)**
78:15
**kind (27)**
21:5;23:4;31:14;
33:22,23;34:1;36:14,
20;40:18,19;41:17;
44:6,6,7,12;45:2,22;
46:1;49:5;57:2;58:9;
59:5;60:14;63:21,22;
80:23;89:1
**kinds (2)**
45:8;90:9
**knew (5)**
38:8,9;50:22;53:18;
54:11;92:17
**knowing (1)**
60:16
**knowledge (1)**
85:6
**knowledgeable (1)**
92:23
**knows (1)**
62:13

## L

**lack (7)**
46:7,8,11,11,13;
59:14;62:13
**lacked (1)**
46:5
**Lafayette (1)**
6:7
**language (2)**
30:18;52:18
**Lasker (5)**
2:15;3:15;72:10;
88:14,15
**last (19)**
10:10;12:22;15:16;
17:11;18:8;32:23;
33:17;35:1;43:13;
44:14,16;60:18;
61:22;66:6;76:2;
79:17;91:10,11;93:6
**lasted (1)**
59:7
**late (1)**
44:13
**LAW (4)**
2:13.5;19:18;54:16;
93:1
**laws (1)**
22:3
**lawsuit (9)**
11:9,14,18;35:3;
50:4,5,7,11;71:11
**lawyer (12)**
27:21;34:11;36:17,
17;37:2,8,13;46:5,21;
60:22;62:22;63:3
**lawyers (6)**
35:10;38:11;47:4,5;

48:5;58:18
**lay (1)**
79:11
**laymen's (1)**
53:1
**LCR (2)**
2:21.5,23
**lead (1)**
54:1
**leading (1)**
87:12
**leaks (1)**
60:9
**learned (6)**
17:7,8;21:15;29:12;
32:13;51:2
**learning (1)**
22:14
**least (3)**
13:14;17:21;27:7
**leave (1)**
31:9
**led (5)**
24:16;86:11;87:7,
18;88:6;92:1
**left (1)**
35:5
**legal (15)**
14:6,11,17,21;
33:11;37:18,19;38:6,
7,8;50:23;54:5,16;
58:17;62:1
**legally (2)**
22:1;51:16
**legislators (2)**
66:4;87:3
**Lenny (2)**
69:12,19
**less (1)**
9:8
**letter (4)**
9:4,6;70:21;81:13
**level (3)**
60:20;83:10;84:9
**Lewis (2)**
11:3;29:16
**License (1)**
2:22.5
**lie (1)**
45:9
**Life (6)**
4:17;21:2,9;57:23;
70:18;72:16
**life-threatening (1)**
64:1
**likely (2)**
18:3;47:15
**likes (1)**
36:3
**limit (1)**
81:20
**limited (3)**
31:7;74:8,8

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**limits (1)**
19:16
**line (2)**
33:17;42:3
**linear (1)**
36:15
**linearly (1)**
43:10
**linked (1)**
66:14
**list (1)**
8:10
**Listen (2)**
61:12;93:2
**lists (1)**
57:19
**lit (1)**
31:9
**little (19)**
21:12,19;30:7;
47:11,22;58:6;60:8;
62:9,22;79:1;80:12;
81:3;82:12;85:16;
86:2,19,20;88:17;
91:5
**livelihood (2)**
86:5,6
**long (4)**
24:1;29:8;33:11;
51:12
**longer (3)**
12:7,15;48:2
**longstanding (3)**
55:11;56:20;57:7
**look (10)**
7:18;17:5;27:21;
28:18;40:16;62:23;
71:23;74:11;88:22;
89:20
**looked (3)**
21:5;80:18;89:17
**looking (7)**
30:17;38:20;57:14;
71:10;72:7;84:13;
89:17
**looks (4)**
66:22;72:2,14;73:7
**loose (1)**
71:10
**loses (2)**
59:21;60:4
**loss (4)**
35:6;86:5,6,8
**lot (6)**
27:12;34:22;42:23;
51:14;54:21;81:9
**low (1)**
54:11
**lower (1)**
40:20
**luck (1)**
25:17

## M

**Mae (1)**
90:9
**main (1)**
55:22
**major (3)**
25:20,21;56:5
**makes (2)**
7:4;61:20
**making (7)**
31:17;36:1;46:5;
49:5;57:19;80:3;84:6
**maladaptive (1)**
56:21
**man (2)**
38:22;47:14
**Manchester (2)**
2:5,5,19
**manic (1)**
56:22
**man's (1)**
81:5
**many (3)**
46:21;56:17;61:15
**marital (1)**
24:9
**mark (21)**
8:7;10:5;11:6;20:2;
66:18;67:9,17;68:8,
19;69:5;70:7,13;72:6,
19;73:10;74:1,17;
75:6;82:16;93:5,6
**marked (32)**
8:9;10:6,7,17;11:7,
8;16:4,7;20:4,5;50:4;
67:11,19;68:9,21;
69:7;70:8,14;72:12,
21;73:12,18;74:5,19;
75:1,7,12,18;76:1,6;
82:4;93:7
**Market (1)**
2:18.5
**marriage (2)**
25:1,4
**married (1)**
7:10
**marrying (1)**
54:23
**Mart (12)**
3:12,20.5;6:1,6,9;
7:22;14:5;20:5;63:14;
67:20;76:6;93:17
**M-a-r-t (1)**
6:6
**Massachusetts (1)**
2:14.5
**material (7)**
13:4,13,14;38:20;
71:16,18;89:21
**materials (4)**
12:16;71:4;82:8,20

**matter (3)**
61:15;74:10;76:23
**may (21)**
3:3,5,6;9:11;15:17;
23:4;27:1;30:8;38:23;
40:20;41:6;65:22;
67:7;71:5;72:3;83:22;
87:20;88:3,4;90:19;
91:5,8
**maybe (7)**
14:10;21:11;24:2;
59:4;62:9,21;71:5
**MCA (1)**
81:21
**mean (29)**
31:21;35:21;39:23;
44:10;47:3,18;48:17;
49:22;53:9;54:11,11;
57:14;60:9,9,12;61:9;
63:2,10;64:6,17;
79:19;81:14,20;83:6,
20,21;86:19;92:23;
93:1
**meaning (1)**
63:16
**means (3)**
40:10;42:23;48:7
**measured (1)**
64:3
**Medical (2)**
54:20;84:23
**meet (3)**
16:18;28:16;33:15
**Megan (1)**
2:21.5
**Mellon (2)**
2:3;6:11
**memory (2)**
52:18;68:18
**men's (1)**
63:9
**Mental (29)**
4:11.5;17:14;18:3,
15,18;30:4;31:18;
32:18;44:21;45:8;
46:12;47:17;48:14,
16;54:16;55:23;
57:12;58:5,15;69:1;
75:16;83:3;85:4,8,11;
87:22;88:7;91:20;
92:4
**mentally (7)**
32:3;35:19;36:9;
64:7,18,21,23
**mention (5)**
65:17,20,23;74:3;
86:16
**mentioned (5)**
6:9;32:19;33:23;
65:13;76:10
**met (3)**
16:16;30:5;36:23
**might (12)**

28:21;29:18;31:20;
38:23;46:7;52:6,23;
57:15;62:22;79:10;
84:10;90:5
**million (3)**
61:14,16;62:2
**mind (3)**
7:2;26:22;66:20
**mine (2)**
9:23;22:12
**minimizing (1)**
40:10
**minor (1)**
40:11
**minute (2)**
14:2;34:13
**minutes (2)**
24:2;29:9
**minutiae (1)**
59:18
**miss (1)**
35:2
**missed (6)**
35:14;36:7,8;50:17;
51:21;52:4,6
**moderately (1)**
40:9
**module (3)**
4:20;39:6;73:17
**moment (5)**
6:9;8:23;15:11;
20:7;55:14
**money (1)**
54:13
**months (1)**
15:16
**Montreal (2)**
5:7;75:15
**more (15)**
7:4;9:8;15:9;21:19,
23;23:10;25:9,10;
27:10;43:1,19;47:11;
48:13;56:18;71:5
**Mortgage (12)**
2:12,12.5;26:7,13,
19,21;27:3;28:7;
33:14;59:6,12;88:16
**mortgages (1)**
34:2
**most (9)**
14:13;21:11;40:12;
43:1;53:5;57:23;
62:21;65:2,2
**movement (1)**
30:19
**MSW (1)**
83:6
**much (4)**
25:17;45:11;66:12;
87:1
**multiple (2)**
47:4;83:5
**Murphy (5)**

2:19.5;3:14;77:6,6;
93:10
**myself (1)**
6:9

## N

**NA (2)**
2:2.5,12.5
**NAB (4)**
4:19.5,21;5:8.5;
80:5
**name (2)**
6:4;8:22
**narcissistic (1)**
56:12
**National (2)**
2:12;88:16
**nature (2)**
39:2;46:15
**near (1)**
84:13
**necessarily (3)**
63:23;64:6,17
**necessary (2)**
55:3;91:13
**need (6)**
8:18;54:3;63:8;
79:9;80:7;81:7
**needed (6)**
27:10;37:8;38:7,8;
53:12;92:2
**needs (2)**
53:16;60:3
**negative (1)**
63:23
**neuropsychological (7)**
39:7,16;52:16;
73:16,22;75:22;81:16
**Neuropsychology (1)**
15:3
**New (11)**
2:2.5,5.5,17,19;3:4;
6:7,11;35:4;54:15;
77:7;93:15
**news (2)**
61:5,7
**Newton (1)**
2:14.5
**next (26)**
6:10;11:6;12:21;
20:3,9;32:8;38:14;
42:6;55:5;66:19;67:9;
68:5,10,20,22;69:5;
70:13,15;72:8,20;
73:11,13,19;74:13,20;
75:2
**NH (1)**
2:23
**Nobody (3)**
53:18;85:4,7
**None (2)**
32:19;78:18

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**normal (6)**
42:8,9,21;52:20;
56:15;58:23
**normally (2)**
56:9;58:21
**North (1)**
2:9
**note (2)**
15:18,22
**noted (3)**
30:23;32:12;88:19
**notes (13)**
4:5.5,8.5,10;66:23,
23;67:2,5,16;68:1,6,
12,14,15
**Notice (3)**
3:5;9:10;27:19
**noticed (1)**
31:11
**notification (1)**
26:14
**Number (3)**
3:19;4:3;5:4

**O**

**objections (1)**
3:5.5
**objective (1)**
84:3
**objectively (2)**
22:17;40:21
**observations (4)**
31:15,17;32:1;
64:13
**observed (5)**
46:10;67:8;86:4;
87:23;88:7
**observes (1)**
30:13
**obsessional (1)**
55:11
**obsessive (5)**
49:6;64:9,16;91:15
**obsessive-compulsive (4)**
44:1;55:18,20,22
**obtain (1)**
11:10
**obvious (6)**
27:18;34:10;39:8;
48:3;49:11;58:20
**obviously (1)**
50:3
**occasionally (1)**
60:9
**occasions (1)**
46:22
**occur (1)**
24:21
**occurred (10)**
17:22;33:8;38:22;
43:8;53:11;59:2,3;
62:6;78:18,20

**occurring (1)**
18:4
**OCD (2)**
44:2;58:6
**October (10)**
10:12,14;12:9,12;
13:16;16:20;17:2;
18:2;23:16;87:23
**Off (21)**
7:20,21;14:1,3;
21:8;33:18;34:13;
52:12;54:22;60:13;
63:11,12;65:4;70:18;
71:16,17;72:10,11;
90:14;93:12,13
**office (12)**
9:14;12:18;13:5;
16:17;23:6;45:15;
50:13;65:21;66:2;
76:12;86:17,23
**OFFICES (1)**
2:13.5
**often (2)**
14:8;21:21
**old (2)**
7:8,9
**once (2)**
16:18;37:9
**one (51)**
7:13;8:7;9:10,12,
13,13;18:12;20:8,8;
21:18;23:15;24:16;
28:5.5;29:6,7;37:2,13,
14;38:19,22;41:2,10;
44:16;46:10;47:3,7;
48:20;53:19;55:21,
23;56:1;58:4;60:15;
65:22;68:15;69:3;
70:7,22;72:6;75:10;
79:17,18,20;81:3,15,
17;87:14,15,21;92:11
**one-page (5)**
70:9;72:22;73:6;
75:8,13
**one-paragraph (1)**
72:22
**ones (8)**
65:3;79:14;80:22;
81:14,21;82:10;89:1,
5
**only (5)**
16:7;23:21;81:14,
15;85:15
**open (2)**
34:1,16
**operating (2)**
22:11;79:3
**opinion (17)**
18:1;28:12;49:16;
54:8;55:2;58:14;62:5;
64:23;66:7,9,15;84:6;
87:18;90:3;91:11,12,
18

**opinions (3)**
16:10;18:18;19:3
**opportunity (1)**
23:15
**opposed (2)**
47:17;56:21
**Order (7)**
11:1,1;17:12;37:7,
17;38:5;83:18
**organic (2)**
31:14;39:2
**others (1)**
87:5
**out (22)**
9:17;11:20;15:13;
22:5,11;23:4;25:4;
34:14;36:21;41:15;
42:16;47:18;51:13;
57:3;58:23;60:9;
61:17;69:2;70:12;
78:7;79:14;82:7
**outraged (1)**
49:8
**Over (8)**
15:16;38:20;59:7;
77:3;80:21,21;86:2;
88:4
**overwhelmingly (1)**
84:11
**own (1)**
75:23

**P**

**P6 (1)**
3:13
**P77 (1)**
3:14
**P88 (1)**
3:15
**P94 (1)**
3:16
**page (12)**
3:16,19;4:3;5:4;
10:10;32:21;35:1;
63:14;68:15;71:22;
86:1;89:11
**pages (9)**
66:22;71:10,14,20;
72:7,13,15;88:22;
89:8
**PAI (2)**
5:5;81:21
**paid (2)**
76:17,19
**panic (1)**
29:1
**Pappas (35)**
2:6;3:13;5:10.5;
6:4;7:20;8:7;10:5;
11:6;14:1,5;15:22;
18:8;20:2;63:7,13;
67:9,17;68:8,19;69:5;

**opinions (3)**
16:10;18:18;19:3

**P**

70:7,13;72:19;73:10;
74:1,17;75:6;82:4;
86:3;88:19;90:6;
92:11;93:8,11,14
**paragraph (8)**
17:5.8,11;32:23;
35:1;63:15;66:6;
91:11
**paranoia (1)**
31:20
**paranoid (2)**
31:5;60:14
**part (5)**
11:14;32:6;35:5;
44:10;47:2;53:5;55:5;
56:16;68:1;71:8;74:4;
75:16,22;81:6;89:18
**particular (7)**
15:11;19:6;42:4;
44:16;58:22;87:15,15
**particularly (1)**
47:6
**past (2)**
8:11;53:15
**patience (2)**
77:2;93:11
**pattern (3)**
49:6;55:12;56:21
**payment (3)**
76:20,21,22
**payments (1)**
26:16
**PC (2)**
2:4.5,13.5
**peers (1)**
81:2
**people (30)**
19:18;21:21;22:7;
27:5;29:1;32:4;33:15;
34:1,2,3,5;43:1;44:5,
5;45:1,9;49:19;56:18;
58:3;60:10,17;61:19;
62:21;63:22;69:11;
70:4,6,11;74:11;
80:18
**perceived (1)**
78:10
**perceives (1)**
62:6
**perceptions (3)**
30:20,22;71:22
**perfect (1)**
58:2
**period (7)**
17:14,17,18,20;
57:1;59:2,7
**person (13)**
19:13;30:15;36:6;
39:13;40:3;41:7;47:9;
48:22;56:19;57:12;
71:21;81:18;89:10
**personal (5)**
31:7;53:16;61:11,

11;89:7
**personal-injury (1)**
45:5
**personality (17)**
40:5,15;43:19;44:1,
15;47:16;48:8,13;
49:12,15,23;55:12;
56:10;62:10;64:9;
75:5;91:15
**persons (1)**
65:11
**person's (2)**
48:20,23
**Peter (8)**
4:9;29:3,6,13,16;
68:7;69:12,15
**PETERS (1)**
2:18
**phases (1)**
30:10
**phone (2)**
23:22,23;29:4;68:7
**physician (1)**
30:10
**physiological (2)**
41:9,19
**pick (1)**
13:4
**piece (2)**
21:3;62:19
**pieces (2)**
36:4;45:17
**pin (1)**
47:12
**PIPER (1)**
2:4.5
**Piro (43)**
4:10.5,18.5;20:20;
23:1,16;24:1,4,9;
25:6;26:2,5,5;28:3,5,
8,12;29:16;53:18;
68:13,16;69:12,17,17;
70:20;71:3,12,20;
72:3,8;73:1,8,9;
77:20;78:20;84:14,
22;85:2,17;88:22;
89:10;90:23;91:2,4
**Piro's (3)**
4:15.5;24:22;89:17
**place (3)**
26:18;35:8;77:21
**places (1)**
86:20
**play (2)**
31:6,20
**please (3)**
6:21;74:1;75:13
**pm (1)**
93:19
**pockets (1)**
44:8
**point (12)**
24:12;25:5;27:11;

Case 1:13-cv-00334-JD Document 120-3 Filed 07/02/15 Page 106 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

31:13;49:3;50:3,9;
53:10;56:14;72:14;
87:14;88:9
**points (2)**
68:17;92:15
**policies (1)**
20:10
**pop (1)**
90:17
**portion (1)**
52:11
**Portsmouth (1)**
6:7
**position (1)**
22:16
**possible (1)**
23:3
**potential (1)**
79:13
**practice (2)**
3:4;83:4
**predominant (1)**
41:21
**premises (1)**
22:11
**preoccupation (1)**
57:19
**prepared (2)**
60:12;65:8
**present (4)**
16:1;36:15;50:2;
63:15
**presented (2)**
48:11;51:14
**presents (1)**
57:4
**press (4)**
15:1,13,14;45:2
**pretty (5)**
46:2;61:2;66:12;
80:6,15
**prevent (2)**
48:10;50:10
**previous (1)**
51:11
**primarily (1)**
18:6
**primary (1)**
87:11
**PRIMMER (1)**
2:4.5
**print (1)**
23:9
**printout (2)**
75:4;82:22
**printouts (2)**
82:11,23
**prior (9)**
7:1;17:8;18:19,22;
19:3;42:18;44:20;
85:21;88:5
**probably (9)**
37:12;40:20;49:22;

50:1;55:14;69:3;
80:18;81:6;88:2
**problem (10)**
22:12;26:7,9,13,19,
20;31:14;33:8;34:7;
39:8
**problems (16)**
31:7,8;33:6;40:23;
41:4;49:13;53:6,20;
56:17,18,19;57:4,15;
92:1,3,7
**procedure (3)**
6:16;43:14;79:3
**proceeding (1)**
26:17
**proceedings (1)**
53:21
**process (9)**
25:14;33:11;34:6;
46:9;49:11;80:3;
89:23;90:11;92:16
**processes (2)**
21:12;39:9
**produce (1)**
10:17
**produced (3)**
9:20;10:2;12:2
**producing (1)**
13:14
**professional (2)**
80:13;91:18
**profile (1)**
75:11
**program (1)**
82:18
**programs (1)**
82:19
**prompted (1)**
13:2
**pronounced (1)**
88:10
**proper (1)**
91:19
**properly (2)**
17:18;49:9
**protocol (2)**
58:8;80:15
**protocols (4)**
15:7;81:10,22;82:1
**provide (5)**
8:15;9:3;17:13;
53:15;76:13
**provided (3)**
15:23;73:4;90:23
**PSTD (2)**
28:13,17
**Psychological (1)**
15:4
**psychologist (3)**
30:9;45:11;83:8
**psychology (1)**
83:17
**psychometric (2)**

84:9,19
**psychometrics (1)**
83:15
**psychotherapy (1)**
83:22
**PTSD (5)**
78:2,7,9;85:19,21
**PTSD/LAS (1)**
71:14
**PTSD/Legal (1)**
28:9
**publication (1)**
15:12
**published (1)**
15:3
**pull (1)**
48:9
**purpose (2)**
19:8;45:10
**purposely (2)**
40:16,18
**purposes (5)**
3:3.5;21:9;22:13,
22;83:5
**pursuant (1)**
15:19
**pursue (2)**
58:17;65:10
**pursuing (5)**
27:5;62:7,17
**put (5)**
40:23;59:20;71:7;
74:6;82:20

**Q**

**qualify (2)**
64:5;88:11
**quick (1)**
7:17
**quite (5)**
12:18;31:12;48:9;
49:17;65:4

**R**

**raise (1)**
54:13
**raised (2)**
31:4;50:18
**RAIT (1)**
4:22
**rated (1)**
43:22
**rather (3)**
42:21;48:13,14
**rational (2)**
44:3;53:4
**rationally (1)**
59:11
**RBS (2)**
2:12.5;11:3
**RDR (1)**

2:21.5
**reaching (1)**
66:9
**read (2)**
18:8,10
**reading (2)**
61:17;89:22
**reads (1)**
19:13
**real (2)**
77:7;87:6
**reality (2)**
21:22;41:6
**really (20)**
21:6,13;22:3,16;
27:10,16,23;34:14;
40:17;41:2;45:12,13;
48:3;58:23;62:7;68:2;
70:5;85:7;88:17;
89:22
**Realty (2)**
2:17;77:8
**reason (9)**
36:21;37:15;38:12;
41:13;45:19;52:5;
84:3;91:18;92:7
**reasons (1)**
48:7
**recall (26)**
9:5,17;12:4,14;
14:13;15:12;17:19;
18:21;19:22;22:13;
24:1;25:12,13,16;
26:14;29:8;33:4;
51:12;52:1,3;65:19,
22,23;68:14;89:17;
90:19
**receive (2)**
91:2;93:18
**received (6)**
23:1;26:14;76:21;
91:1,3,6
**recent (1)**
14:13
**recently (2)**
15:1,1
**Recess (1)**
14:4
**recognize (1)**
61:22
**recognized (2)**
37:6,16
**recognizes (1)**
63:22
**recollection (1)**
37:1
**Recollections (3)**
4:16.5;21:8;72:15
**Record (19)**
4:21;7:3,20,21;
14:1,3;15:18,22;
20:16;63:11,12;
72:10,11;73:21;74:6;

75:21;84:14;93:12,13
**records (2)**
84:22,23
**recourse (3)**
37:19;38:7,8
**recover (3)**
33:12;62:1;63:2
**refer (5)**
8:19;26:22;51:21;
60:7;91:10;92:19
**reference (1)**
18:23
**Referral (2)**
17:5;19:7
**referred (5)**
20:7;43:23;56:1,2;
70:19
**referring (5)**
17:17;20:8;88:20;
90:4,22;92:13
**refers (3)**
48:22;71:11,11
**refinish (1)**
35:8
**reflect (1)**
18:5
**reflected (1)**
18:15
**regained (2)**
14:16,21
**regaining (1)**
15:8
**regarding (8)**
7:23;10:13;16:8,11;
17:1,13;23:20;76:7
**Registered (1)**
2:22
**relate (2)**
19:4;43:11
**related (5)**
24:23;43:19;59:11;
64:4;85:12
**relating (1)**
23:8
**relationship (2)**
24:10;63:4
**relatives (1)**
54:12
**releases (1)**
70:4
**relevant (5)**
22:21;24:6;29:11;
30:23;32:14
**relief (1)**
58:17
**relocate (1)**
35:4
**rely (1)**
66:10
**remember (1)**
29:22
**rendered (2)**
16:11;18:18

Case 1:13-cv-00334-JD   Document 120-3   Filed 07/02/15   Page 107 of 110

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

**rental (1)**
35:8
**repair (1)**
24:9
**repeat (2)**
6:17;52:23
**rephrase (1)**
6:22
**report (40)**
3:21.5;9:20;10:2,8,
12,17;12:2;13:16;
16:4,7,8,10,20,21;
17:2,20;18:1,23;
20:16,17;21:16;
22:18;24:4;26:4,23;
29:10;30:23;32:2,8,
23;36:15;38:14;
52:11;63:14;65:8;
66:6;77:13;86:2;
89:18;91:6
**reported (1)**
26:6
**Reporter (3)**
2:21.5,22,22.5
**reporting (2)**
26:1,2
**reports (1)**
35:9
**represent (6)**
6:10,12;11:13;45:4;
77:6;88:15
**representations (2)**
21:21;85:14
**represented (1)**
22:6
**Representing (4)**
2:2.5,12,17;12:7
**represents (1)**
47:8
**reputable (2)**
61:10,11
**requested (2)**
17:12;18:10
**required (1)**
19:17
**requires (1)**
84:5
**research (2)**
14:19;34:18
**researched (1)**
15:6
**resentment (1)**
44:8
**reserved (1)**
3:6
**resistant (2)**
46:7,19
**resolve (3)**
26:9;27:16;34:7
**respect (3)**
10:19;88:18;90:12
**respond (1)**
45:20

**response (2)**
34:4;43:8
**responses (2)**
75:23;82:21
**responsible (1)**
35:6
**result (7)**
39:10,20;40:22;
45:3;59:10;86:22;
87:2
**resulted (1)**
47:16
**resulting (1)**
87:22
**results (3)**
43:18;52:12;64:12
**retain (2)**
13:7;74:10
**retained (8)**
5:10,5;8:21;9:16;
10:16,18;11:17;
13:10;36:23
**retainer (2)**
9:4,6
**retaining (1)**
22:9
**retention (1)**
8:18
**return (1)**
93:16
**reunification (1)**
25:18
**reunite (1)**
25:1
**review (4)**
20:16,22;62:2;
89:16
**reviewed (3)**
22:14,19;44:15
**reviewing (2)**
43:18;51:18
**revolves (1)**
56:13
**Reynolds (4)**
39:11;74:15;81:1,
18
**right (68)**
10:3;18:2,3;19:5;
22:8;25:9;27:12,22;
28:8,18;30:14;37:14;
39:15;41:14;43:12,
16;44:5,9;45:9,12;
50:12,18;53:9;54:6;
55:9,16;56:6,9;57:23;
61:9,12,13;62:4,4,14,
18;64:7,22;67:15;
68:4;77:15,18;78:8,
13;79:3,16,19;80:8,9;
82:12;83:2,4;84:1,6,
7;85:15,17;86:15,23;
87:3,20;90:8;92:23
**righted (3)**

63:5,5,6
**rigid (4)**
40:19;44:2,6;61:3
**rigidity (6)**
49:5,15;61:20;62:5,
11;64:15
**rmurphy@wadleighlawcom (1)**
2:20
**Road (1)**
6:7
**Robert (1)**
2:19.5
**role (2)**
31:6,20
**room (3)**
30:16;63:9;70:12
**routinely (1)**
21:19
**RSA (1)**
2:23
**ruled (1)**
78:6
**ruling (1)**
79:14
**ruminate (1)**
41:16
**rushed (1)**
23:4

**S**

**safety (1)**
53:17
**same (5)**
39:16;42:4;50:15;
83:7,10
**satisfied (1)**
33:10
**saw (10)**
18:6,12;24:8;27:2;
42:18;51:8;85:2,4;
86:12;87:7
**saying (18)**
13:19;17:6;21:7,14;
22:7,20;24:3;31:3;
32:12;39:10;41:7;
42:7;46:1;52:12;
53:23;60:19;69:14;
91:23
**scale (4)**
41:11;42:5,12,14
**scales (3)**
40:20;42:9,10
**schedule (1)**
20:9
**scheduling (1)**
13:2
**score (1)**
82:3
**scored (2)**
39:13,17
**scores (3)**
40:20;42:7;75:4

**scoring (13)**
4:19.5,22,23;5:5,6,
7.5,8.5;73:15;74:15,
22;75:10,15;82:16
**screening (7)**
4:19.5;39:6;52:17;
73:16;79:13;80:2,7
**Seabrook (1)**
35:4
**searching (1)**
26:8
**second (3)**
20:19;64:9;74:23
**section (4)**
20:16;30:3;32:8;
38:14
**security (1)**
74:3
**seeing (5)**
23:5;25:6;38:10;
51:7,8
**seem (2)**
56:13;64:4
**seemed (2)**
46:8;92:7
**seems (4)**
59:17;89:7,9,11
**sees (2)**
40:19;62:18
**selected (1)**
80:12
**Senator (1)**
66:1
**send (3)**
9:14;23:9;93:17
**sense (4)**
34:20;37:9;41:17;
65:2
**sent (3)**
11:11;70:17;91:8
**sentence (1)**
17:11
**separate (1)**
72:17
**separated (1)**
24:12
**separation (1)**
24:17
**September (4)**
11:2;18:13;30:5;
38:5
**series (1)**
72:13
**serious (1)**
58:5
**seriously (1)**
28:21
**serve (2)**
11:17;12:2
**served (1)**
15:19
**set (2)**
32:1;62:20

**settlement (1)**
14:11
**seven (1)**
14:10
**several (5)**
35:10;44:14;71:14;
87:21;89:8
**severe (1)**
58:20
**severely (1)**
58:16
**sexual (2)**
19:19;54:19
**shade (1)**
60:13
**shall (1)**
3:2.5
**shape (1)**
46:2
**Shedler-Westen (1)**
43:14
**sheet (12)**
4:22,23;5:5,6,7.5,
8.5;74:15,22;75:15,
21;82:17;93:16
**sheets (1)**
75:10
**shelter (1)**
53:17
**shift (1)**
63:9
**short (1)**
41:20
**shortcomings (1)**
40:11
**show (20)**
7:14;8:3;10:7,21;
11:4;20:5;68:10,22;
69:8;70:9,15;73:13,
19;74:13,20;75:2,8,
13,19;76:2
**showed (3)**
12:18;50:12,14
**showing (1)**
74:9
**sight (2)**
59:21;60:4
**sign (2)**
31:18;32:2
**signature (4)**
3:8;10:10;60:11;
89:11
**signed (2)**
3:7.5;71:9
**significance (1)**
43:2
**Signs (5)**
30:12;41:9,19;
43:23;44:20
**similar (1)**
42:17
**simply (4)**
34:6;59:18;61:5;

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

80:6
**sit (2)**
  17:19;81:18
**sits (1)**
  44:12
**sitting (5)**
  18:21;23:4;69:4;
  71:15;89:20
**situation (14)**
  21:23;22:1;31:6;
  33:2;34:12;48:22;
  49:13;51:13;58:22;
  60:15;61:4;64:1,14;
  83:21
**situations (2)**
  58:2;65:16
**sketched (1)**
  9:17
**sleep (1)**
  45:18
**sleeping (1)**
  41:20
**slight (1)**
  78:2
**slippage (1)**
  60:8
**slowed (1)**
  37:3
**smart (1)**
  40:2
**Smith (2)**
  36:17,17
**solve (1)**
  53:6
**somebody (11)**
  14:16;15:10;28:21;
  38:19;45:16;47:4;
  50:17;56:4,22;61:7;
  85:12
**someone (11)**
  14:20;40:16;41:5;
  60:20;64:18,20;77:3;
  78:14;81:8;83:21;
  92:17
**someone's (1)**
  14:6
**someplace (1)**
  89:19
**sometimes (6)**
  22:5;32:4;47:3;
  62:12;77:10;79:19
**somewhere (1)**
  71:6
**son (6)**
  7:13;29:3,6,13;
  53:19;85:15
**sorry (3)**
  10:1;38:1;90:7
**sort (22)**
  9:4;11:19;12:20;
  21:3;24:20;25:18;
  36:1,3,14;38:7;41:17;
  46:17;50:15;51:13,

13,15;61:20;64:13,
  15;70:17;89:10;91:23
**sorted (1)**
  34:14
**sounded (1)**
  82:3
**sounds (1)**
  77:18
**spatial (1)**
  52:18
**speak (7)**
  23:15;29:6;51:11;
  69:17,19,21,23
**speaking (1)**
  68:6
**specific (6)**
  17:20;43:11;50:23;
  78:12;83:15;92:20
**specifically (4)**
  35:13;42:3;88:20;
  90:2
**specified (1)**
  63:17
**speech (1)**
  30:17
**spell (1)**
  56:3
**spent (2)**
  26:8;33:12
**spoke (12)**
  12:13,21;23:19,21;
  24:1;29:3,8;53:18;
  61:15;68:15;69:14;
  87:3
**spoken (1)**
  12:9
**spouse (2)**
  86:8,9
**stand (2)**
  22:10;66:19
**Standard (15)**
  4:4,5;9:6,8;19:12,
  21;20:6;54:5,15,17,
  18;79:2;80:15;81:10,
  22;84:5
**standpoint (1)**
  55:6
**STARR (1)**
  2:18
**start (2)**
  52:12;72:15
**started (5)**
  25:3,6,9;28:5;33:13
**starting (2)**
  32:20;33:7
**starts (1)**
  60:13
**state (10)**
  6:4;17:14;18:3,6,
  16,19;19:18;34:2;
  63:14;65:14
**Statement (4)**
  4:18;72:23;73:9;

86:1
**states (3)**
  6:2;17:12;26:4
**stating (1)**
  91:17
**statistics (1)**
  83:14
**status (6)**
  4:11.5;30:4;69:1;
  75:16;85:8,12
**stenographer (1)**
  6:5
**stenotype (1)**
  3:3
**steps (2)**
  91:13;92:8
**Steve (5)**
  4:18.5;68:13;70:20;
  73:1,9
**Steven (1)**
  20:20
**still (2)**
  41:5;59:9
**STIPULATIONS (2)**
  3:1;93:15
**stopped (2)**
  37:4;89:22
**stops (1)**
  57:1
**story (1)**
  27:9
**STRAWN (1)**
  2:8
**Street (4)**
  2:5,8,5,14,18.5
**strength (1)**
  49:1
**strengths (1)**
  48:20
**stress (1)**
  41:11
**stress-induced (2)**
  79:7;86:12
**stressor (3)**
  25:20,22;64:4
**stressors (5)**
  86:11,15;87:7,11;
  88:5
**stress-related (1)**
  63:18
**strike (5)**
  11:1;31:16;35:16;
  51:1;66:5
**strongly (2)**
  52:20;62:12
**strongly-held (1)**
  62:6
**structure (2)**
  48:9;17
**struggle (1)**
  62:22
**study (1)**
  14:19

**style (2)**
  40:15;44:3
**submission (1)**
  3:7.5
**Subpoena (5)**
  5:9.5;15:19;16:1;
  76:3;93:5
**subscales (1)**
  41:10
**substance (2)**
  13:16,20
**subsumed (1)**
  54:21
**suddenly (3)**
  56:4,8,22
**suffer (1)**
  28:19
**suffered (1)**
  58:15
**suffering (3)**
  28:9;39:21;91:21
**sufficient (1)**
  29:23
**sufficiently (1)**
  88:10
**suggest (2)**
  53:12;63:7
**suggested (2)**
  29:18;69:23
**suggestive (2)**
  31:14;39:4
**suicidality (1)**
  19:19
**suit (2)**
  51:23;52:4
**summarize (3)**
  29:10;33:5;66:7
**summarizes (2)**
  32:10;38:14
**summary (5)**
  22:18,20;52:8;55:5;
  91:11
**supposed (1)**
  65:15
**Sure (15)**
  6:6;7:7;8:20;16:6;
  18:7;23:12;25:13;
  38:2;52:10;62:10;
  66:21;77:12;80:14;
  82:13;87:9
**surrounding (2)**
  25:8;28:7
**suspect (1)**
  34:11
**SWAP (2)**
  43:16;81:21
**SWAP-200 (2)**
  5:6;75:10
**switched (1)**
  25:18
**sworn (1)**
  6:1
**Sykes (121)**

4:9;7:23;8:18,21;
  9:19;10:2,13,16,19;
  11:3;12:8,9;13:3,10,
  17,20;15:23;16:8,11,
  16;17:1;19:9;21:1,8,
  10;23:8,20;24:6,8,12,
  17,19,23;25:1,6,19,
  22;26:6,12,20;27:7;
  28:1,4,5,8,13,16;
  29:12,16,16;30:6;
  31:15,17;32:1,3,10,
  17;33:1;35:2,12,16,
  18;37:6,16;38:2,15;
  39:11,13,17,21;40:2;
  43:17;44:18,19;
  45:12,22;47:13;48:4;
  50:3;51:4,7,8;52:13;
  53:1,15;54:2,8;55:2,
  6;58:15;62:7,17;
  63:16;64:20,23;
  65:10;67:3,6,22;68:7;
  69:3,12,15;70:17;
  71:5,7,16;73:4;75:17,
  23;76:8,17,22;84:19;
  85:2,13,18;89:8;
  90:14;91:12,19
**Sykes' (9)**
  11:8;17:8,14;24:16;
  25:7;28:7;29:3,6;
  86:11
**Sykes's (4)**
  42:7;57:5;60:19;
  76:23
**symptom (3)**
  42:6;74:22;87:16
**symptomatology (1)**
  88:10
**Symptoms (4)**
  30:11;57:6;66:15;
  91:16
**Syndrome (2)**
  28:10,13
**syntonic (1)**
  56:3

**T**

**talk (10)**
  13:5;19:14,15;
  29:17,18;34:3;47:23;
  61:19;66:3;86:3
**talkative (1)**
  31:12
**talked (7)**
  21:4;33:7,10;35:21;
  65:13;79:1;86:19
**talking (9)**
  27:5;30:16;33:13,
  20,21;37:1;38:19;
  71:21;90:5
**talks (1)**
  55:5
**tangents (1)**

33:19
**tasks (1)**
75:23
**telling (8)**
17:22;27:2;46:7;
47:5;51:12;52:3;
60:21,22
**temporarily (1)**
37:3
**tendency (1)**
90:17
**tension (1)**
29:23
**term (3)**
27:8;62:13;92:6
**termed (1)**
28:9
**terms (7)**
17:21;21:11;51:7;
52:5;53:1;78:6;80:11
**terrible (1)**
30:12
**terror (1)**
28:23
**test (22)**
39:5,11,12;40:8,9,
13,22;42:2,6,8,18;
43:13,18,19;74:3,16;
75:11;81:1,18;82:15,
18;83:14
**testamentary (3)**
54:6,9,17
**testified (2)**
8:11,12
**testify (2)**
11:23;85:7
**testimony (3)**
18:10;74:7;90:1
**testing (8)**
64:12;82:7;84:9,12,
14,16,19;85:9
**tests (23)**
18:5,12,15;38:15,
18;39:20;44:14,17;
69:4;79:22;80:16;
81:9,11;82:5,11,14;
83:2,7,13,14,18,22;
84:3
**theory (2)**
46:3;48:6
**therapy (1)**
25:19
**therefore (1)**
60:23
**thinking (7)**
31:5;37:11;49:6;
59:23;60:14;92:20,21
**third (6)**
3:22,5;10:22;11:4,
8;20:18;50:5
**Thomas (2)**
2:6;48:19
**though (3)**

45:14;50:9;61:9
**thought (21)**
21:12;22:21;24:5;
27:17;28:15,20;
29:10;30:18;31:2,6,
19;33:13;34:5;35:19;
43:22;49:10;50:19;
53:4;89:5,23;90:11
**thoughts (2)**
42:15,20
**Threat (1)**
78:13
**threatening (3)**
78:10,11,12
**threats (2)**
19:18;42:13
**three (5)**
15:16;41:14;66:22;
72:7;90:12
**throughout (2)**
38:10,11
**till (1)**
34:13
**Timely (4)**
4:18;45:20;72:23;
73:8
**times (6)**
12:11;14:8;33:18;
44:11;54:8;60:3
**titled (1)**
69:9
**today (7)**
18:21;46:16;50:6;
71:15;74:8;76:4,7
**today's (1)**
16:1
**together (4)**
48:9;71:1;72:16,18
**told (9)**
12:7;24:19;33:6;
34:5;35:3;50:13;
60:12;61:12;67:6
**tongue (1)**
88:3
**took (7)**
51:12;58:23;67:2;
68:1,6,12,14
**top (2)**
20:8;71:10
**towards (2)**
35:1;44:15
**tpappas@primmercom (1)**
2:6.5
**track (1)**
77:11
**traffic (1)**
58:4
**training (1)**
83:15
**trait (1)**
60:18
**traits (9)**
49:15,19;50:1,10,

10;57:18;58:12;
62:10,15
**transaction (1)**
46:15
**transcribed (1)**
3:3
**transcript (1)**
93:17
**trauma (5)**
42:6;63:17;74:22;
87:15;91:16
**trauma-related (3)**
42:5;43:7;78:4
**traumatic (1)**
41:11
**treated (1)**
56:23
**trees (2)**
59:21;60:4
**trial (1)**
3:6
**tried (2)**
36:13;82:3
**triggering (1)**
78:18
**tripped (1)**
88:4
**trouble (1)**
41:20
**true (6)**
21:17;22:15;86:13;
87:8,13,20
**trust (1)**
63:3
**try (1)**
6:21
**trying (8)**
25:1;27:15;34:3;
40:16,18;42:20;
47:20;79:12
**TSI-2 (2)**
4:23;81:21
**turn (1)**
77:3
**turning (1)**
38:20
**turns (1)**
22:10
**two (11)**
18:11;20:17;30:1,
10;39:20;43:3;48:19;
55:22;72:6,15;78:3
**type (16)**
14:12;19:20;26:17;
27:6,14;28:20;29:2;
36:5;38:23;41:18;
45:3;51:18;55:1;58:8;
71:14;78:16
**typed (2)**
72:13,22
**types (3)**
45:1;65:15;80:19
**Typically (2)**

49:19;63:11
**Tyron (1)**
2:8.5

**U**

**ultimate (1)**
31:1
**ultimately (1)**
80:12
**unable (5)**
37:14;53:15;91:13;
92:2,8
**unclear (1)**
85:16
**under (7)**
3:4;17:5;19:7;
20:12;47:11;54:15,21
**under-respond (1)**
44:10
**understands (1)**
59:16
**understood (15)**
6:20;37:20,21;38:3;
47:1,14;48:5,5,6;
79:21,21;80:5;83:6,
23;86:22
**unhappy (2)**
86:22;87:2
**universe (1)**
74:10
**unlikely (1)**
60:12
**unnumbered (1)**
71:23
**unpleasant (2)**
42:15,20
**unsupervised (1)**
31:10
**unusual (1)**
47:22
**unwilling (1)**
47:10
**up (21)**
12:18;13:4;14:8,12;
33:17;37:22;38:4;
42:22;44:8;50:13;
54:20;59:17;60:7,18;
61:17,22;62:20;
63:13;77:4,9;79:22
**updated (1)**
8:6
**upon (6)**
26:21;34:17;37:22;
38:4;79:23;85:13
**upset (1)**
35:22
**use (13)**
9:7;13:7;37:13;
67:15,21;80:3;81:9,
10;82:17,18;83:22;
84:2;92:5
**used (6)**

3:3.5;21:9;80:9,22;
81:7;83:3
**useful (2)**
11:22;30:2
**using (2)**
48:18;80:8
**usual (1)**
93:14
**usually (1)**
47:23

**V**

**validity (1)**
42:9
**variety (2)**
15:5,6
**various (5)**
38:14,18;62:10;
66:3;92:15
**venue (5)**
91:14,20;92:12,19;
93:4
**Verified (4)**
3:22.5;10:23;11:9;
20:18
**version (1)**
9:18
**versus (1)**
51:7
**victim (1)**
46:2
**Victor (2)**
69:12,17
**view (4)**
50:13;61:3,7,8
**views (2)**
62:6,11
**vigilant (1)**
42:12
**vindication (1)**
62:20
**visit (1)**
63:8
**vitae (1)**
3:20
**volumes (1)**
78:3
**voting (1)**
54:23

**W**

**WADLEIGH (1)**
2:18
**waiting (2)**
30:16;70:12
**waived (2)**
3:5.5,8
**wants (5)**
62:14,18,20;63:4,5
**way (15)**
43:6,9;48:14;57:7,

Lewis B. Sykes, Jr. vs.
RBS Citizens, N.A., et al.

Eric G. Mart - Vol. I
June 10, 2015

10,18,22;59:20;
62:19;63:5;70:2,20;
76:14;79:8;87:10
**ways (1)**
59:16
**weaknesses (2)**
48:21;49:1
**Wechsler (2)**
81:7;82:15
**weeks (1)**
12:22
**well-educated (2)**
40:3;53:2
**weren't (2)**
38:12;92:20
**what's (6)**
22:6;27:20;30:17,
18;43:23;56:14
**whatsoever (1)**
91:4
**When's (1)**
12:21
**Whereas (2)**
57:2;62:21
**whichever (1)**
76:14
**who's (1)**
89:2
**whose (1)**
8:22
**wife (7)**
24:13,18,20;25:2;
35:5;70:4;90:20
**WINSTON (1)**
2:8
**within (5)**
3:7.5;8:2;19:21;
23:2;83:17
**without (1)**
87:22
**witness (4)**
11:18;12:3;13:7,11
**wonder (1)**
10:1
**wording (1)**
29:22
**words (19)**
22:1;27:9;36:2,16;
37:10;40:2;41:12;
45:3,23;46:4,15;
48:23;51:14;53:1;
56:11;58:10;62:21;
73:7;81:5
**work (13)**
8:18;10:13;15:14;
17:1,4,24;23:28:11;
33:9;35:7;48:19;76:8,
17;77:20
**worked (2)**
37:2;58:1
**working (3)**
12:15;25:9;76:22
**world (1)**

56:13
**worry (1)**
41:16
**worth (5)**
61:13,16,18;62:23;
63:1
**wound (1)**
60:6
**wrinkle (1)**
88:3
**writing (1)**
89:2
**written (2)**
89:9;91:3
**wrong (9)**
27:13;39:23;56:9;
59:6;60:13;62:14,18;
63:4;78:21

### Y

**years (3)**
7:9;8:11;53:15
**York (2)**
2:2.5;6:11

### Z

**zone (2)**
59:1;78:15

### 0

**02458 (1)**
2:14.5
**03101 (2)**
2:5.5,19
**03801 (1)**
6:8

### 1

**1 (3)**
3:20;8:8,9
**10 (5)**
3:21.5;4:14;11:2;
53:15;70:14
**10/22/14 (1)**
3:21.5
**10:48-10:53 (1)**
14:4
**100 (1)**
2:8.5
**11 (8)**
3:23;4:15.5;72:12;
88:20,21;89:4,9;
90:13
**12 (8)**
4:16.5;72:21;88:20;
89:3;90:5,6,7,13
**12:53 (1)**
93:19
**13 (6)**

4:18;73:12;88:21;
90:3,6,13
**14 (4)**
3:7.5;4:19.5;73:18;
93:16
**15 (5)**
4:21;24:2;29:9;
74:2,5
**150 (1)**
2:14
**16 (4)**
4:22;23:16;74:18,
19
**17 (2)**
4:23;75:1
**18 (3)**
5:5;49:23;75:7
**19 (2)**
5:6;75:12
**19th (1)**
2:5

### 2

**2 (7)**
3:21.5;10:5,6,7,17;
16:4,7
**20 (5)**
4:4.5;5:7;24:2;
29:9;75:18
**200 (1)**
43:16
**2008 (5)**
17:22;33:7;84:20;
85:5,8
**2008-2009 (2)**
19:1;85:12
**2009 (4)**
17:23;84:20;85:5,8
**2010 (3)**
84:20;85:2,18
**2012 (2)**
85:19,21
**2013 (1)**
77:17
**2014 (16)**
10:12,14;11:2;
12:10,13;13:16;
16:20;17:3;18:2,13;
23:16;30:5;38:5;
84:16,17;88:1
**21 (2)**
5:8.5;76:1
**22 (11)**
5:9.5;10:12,14;
12:9,12;13:16;16:20;
17:2;18:2;43:16;93:7
**23 (2)**
18:13;30:5
**230 (1)**
6:7
**28202 (1)**
2:9

**29th (1)**
2:8.5

### 3

**3 (6)**
3:22.5;11:7,8;22:4,
5;90:2
**310-A (1)**
2:23

### 4

**4 (5)**
4:4.5;20:4,6;32:21;
35:1

### 5

**5 (6)**
4:5.5;67:11,13;
68:1;78:1,5
**59 (1)**
7:9
**5A (5)**
4:7;67:18,19,21;
68:3

### 6

**6 (2)**
4:8.5;68:9
**61 (1)**
2:23
**67 (2)**
4:6,7.5
**68 (2)**
4:9,10.5
**69 (1)**
4:11.5

### 7

**7 (2)**
4:10;68:21
**70 (2)**
4:13,14.5
**70-year-old (1)**
38:22
**72 (2)**
4:15.5,17
**73 (2)**
4:18.5,20
**74 (2)**
4:21,22
**75 (4)**
4:23;5:5,6,7.5
**76 (1)**
5:8.5

### 8

**8 (5)**

3:20.5;4:11.5;
63:14;69:7;86:1

### 9

**9 (3)**
4:12.5;70:8;84:5
**9/23/2014 (1)**
16:13
**900 (1)**
2:5
**92 (1)**
3:13
**93 (1)**
5:9.5
**95 (1)**
2:18.5